## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| John Doe 1 & John Doe 2, on behalf of themselves and a Class of all others similarly situated | § § § § | |
| *Plaintiffs* | § § | |
| v. | § § | Civil Action No. |
| Harris County, Texas; Lina Hidalgo, Rodney Ellis, Adrian Garcia, R. Jack Cagle, Tom S. Ramsey, all in their official capacities as members of the Harris County Commissioners Court; and Edward Gonzalez, in his official capacity as Sheriff of Harris County Texas | § § § § § § § § § | |
| *Defendants* | § § | Jury Trial Demanded |

## PLAINTIFFS' ORIGINAL COMPLAINT
## FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs John Doe 1 and John Doe 2, individually and on behalf of all others similarly situated as a Class of Harris County employees who are currently employed in the Harris County Jail or have been employed in the last two years (collectively "Plaintiffs"), file this suit against Harris County (the County), by and through the individual members comprising Commissioners Court (the Commissioners) in their official capacity, and the elected Harris County Sheriff (the Sheriff) in his official capacity (collectively "Defendants") acting and or omitting to act in their official

capacities for violating all Plaintiffs' Fourteenth Amendment equal protection and due process rights to be free from state created or increased danger. Defendants have committed acts and or omissions with a deliberant indifference to follow their ministerial duties under state and federal laws to Harris County employees assigned to the Harris County Jail Facilities.[1] The Plaintiffs show as follows:

## **PARTIES**

*Plaintiffs:*

1.      Plaintiffs are all current or former employees of Harris County who currently work or been assigned to work in Harris County Jail Facilities in the last two years. The Plaintiffs for their protection shall be referred to has Jane or John Doe; however, that is a pseudonym for the actual employees herein described. Plaintiffs all fear retribution, retaliation, discrimination, and disciplinary action to include termination for coming forward and identifying specific impermissible acts by Defendants acting in their official capacities. All Plaintiffs additionally seek to protect their identity under the Fifth Amendment and Fourteenth Amendments as well as pursuant to the state and federal whistle blower statutes.

---

[1] Harris County Jail Facilities for the purposes of this lawsuit includes all Harris County Jails and holding cells under the command of the Harris County Sheriff.

2.      A motion and supporting memorandum will be filed with the Court asking for Plaintiffs, to include all class members, to remain anonymous throughout the proceeding.

*Class Representatives*:

3.      John Doe 1 is a licensed peace officer and jailer. He retired at the rank of lieutenant from Harris County in March 2021 after serving thirty-seven years. Since his retirement, he has been employed by a third-party employee union and charged with monitoring jail conditions and to serve as an employee liaison with Command Staff on jail issues.

4.      John Doe 2 is a licensed peace officer and jailer. He has been employed by Harris County for twenty years and has served as a jail supervisor in the last five years.

*Class Members:*

5.      The testament of some class members is included in this complaint. Jane Doe 1-54 and John Doe 3-35 are all Harris County employees either currently working in the Harris County Jail or have worked in the Harris County Jail in the last two years. Class members work as jail supervisors, deputies, detention officers (DOs), medical staff, and civilian personnel. They have served Harris County between 10 months and 35 years or more.

*Defendants:*

6.      Harris County Commissioners Court is comprised of one County Judge and four elected Commissioners for each of the four precincts. "As the main governing body of Harris County, the Commissioners Court plays a critical role that is part administrative, part legislative, and part judicial. Its many responsibilities include adopting a budget; setting tax rates; calling for bond elections; building and maintaining county infrastructure such as roads and bridges; and overseeing county courthouses, jails, libraries, parks, and the Harris County Flood Control District."[2]

7.      Commissioners Court, by legislative mandate, is responsible for the ultimate oversight and operational standards of the Harris County Jail Facilities and for compliance with the directives promulgated by the Texas Commission on Jail Standards ("TCJS"). Tex. Loc Gov't Code §§351.001-351.002; Tex. Gov't Code §511.009. By legislative and constitutional law, Defendants are responsible for protecting the constitutional rights of all persons held in Harris County custody at the jail and other detention facilities and or employed by Harris County. *See Alberti v. Sheriff of Harris County, Texas,* 406 F. Supp. 649, 669 (S.D. Tex. 1975). At all times described herein, Defendants are acting under color of state law. Defendants are being sued in their official capacities for declaratory and injunctive relief having acted and

---

[2] *About Judge Lina Hidalgo*, (last accessed Sep 3, 2021) https://cjo.harriscountytx.gov/about.

or failed to perform their ministerial duties regarding the funding, staffing and regulatory compliance requirements for the Harris County Jail facilities throughout the county.

8.     County Judge Lina Hidalgo is the duly elected County Judge for Harris County, Texas. She is being named in her official capacity *ultra vires*. She has held this seat since January 1, 2019. The County Judge is the presiding officer of the Commissioners Court. Judge Hidalgo, at all times described herein, was acting under color of state law. She is being sued in her official capacity only for declaratory and injunctive relief.

9.     Commissioner Rodney Ellis is the duly elected Harris County Commissioner from Precinct 1. He is being named in his official capacity *ultra vires*. He has held this seat since January 9, 2017. Commissioner Ellis, at all times described herein, was acting under color of state law. He is being sued in his official capacity only for declaratory and injunctive relief.

10.     Commissioner Adrian Garcia is the duly elected Harris County Commissioner from Precinct 2. He is being named in his official capacity *ultra vires*. He has held this seat since January 1, 2019. Commissioner Garcia, at all times described herein, was acting under color of state law. He is being sued in his official capacity only for declaratory and injunctive relief.

11.     Commissioner Tom S. Ramsey is the duly elected Harris County Commissioner from Precinct 3. He is being named in his official capacity *ultra vires*. He has held this seat since January 1, 2021. Commissioner Ramsey, at all times described herein, was acting under color of state law. He is being sued in his official capacity only for declaratory and injunctive relief.

12.     Commissioner R. Jack Cagle is the duly elected Harris County Commissioner from Precinct 4. He is being named in his official capacity *ultra vires*. He has held this seat since October 3, 2011. Commissioner Cagle, at all times described herein, was acting under color of state law. He is being sued in his official capacity only for declaratory and injunctive relief.

13.     Harris County Sheriff Edward Gonzalez is the duly elected sheriff for Harris County. He has held this position since January 1, 2017. He is being named in his official capacity *ultra vires*. Harris County Sheriff Edward Gonzalez, at all times described herein, was acting under color of state law. He is sued in his official capacity only for declaratory and injunctive relief.

14.     Collectively, the Defendants are referred to as Harris County.

## **JURISDICTION AND VENUE**

15.     This Court has jurisdiction over claims raised in this complaint under 42 U.S.C. §1983 and §1988 and §1997 as well as 28 U.S.C. §1331, §1343, § 2201 and § 2202.

16.     Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(1) and (2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and all parties reside in the Southern District of Texas.

## STATEMENT OF THE CASE

17.     Plaintiffs, on behalf of themselves and all those similarly situated, bring this lawsuit because of the Defendants continued intentional refusal to perform their ministerial duties to adequately fund and staff the Harris County Jail Facilities, including the 701 San Jacinto Jail ("701" or "701 jail"), the 1200 Baker Street Jail ("1200" or "1200 jail"), and the Joint Processing Center ("JPC") (collectively "the jail" or "Harris County jail"). Defendants continued intentional refusal to adequately fund and or staff the jail continues to occur even though they have actual knowledge of the well-known and blatantly dangerous conditions being created and directly caused by their intentional failures towards their ministerial duties to provide adequate staffing and funding for the jail facilities which has reached critical and historic deficiencies resulting in dangerous conditions and injuries to Plaintiffs.

18.     Employees, both civilian and in law enforcement, are forced to work in escalating levels of dangerous conditions that would be avoidable if the

Defendants performed their statutory mandated ministerial duties to properly fund and staff the Harris County Jail.

19.     Defendants knowingly subject Plaintiffs to extremely dangerous conditions in the jail in violation of the U.S. Constitution through 42 U.S.C. §1983 and have committed conspiracy through 42 U.S.C. §1985 and §1986 to keep the jail understaffed and underfunded so that other discretionary County projects can be funded.

20.     Defendants are well aware and know or have reason to know that the understaffing and underfunding of the jail poses a danger to Plaintiffs, that Plaintiffs are working extreme hours – including forced mandatory overtime – which put them and the inmates at risk, and that the mandatory minimum standards set by the Texas Commission of Jail Standards (TCJS) as well as federal requirements are not being met.

21.     Plaintiffs have no reasonable recourse or other administrative or legal avenue for relief. Their cries for help and aid have gone intentionally unanswered by the Defendants. Injunctive and declaratory relief are the only means to the address failures perpetrated by the Defendants in order to force them to follow TCJS rules and guidelines and cease and desist from continuing to violate the Plaintiffs' constitutional rights.

22.     The Defendants have intentionally shown deliberate indifference to the hazardous, hostile, and dangerous working conditions Harris County employees are subjected to daily and they have refused to perform their ministerial acts necessary to remedy the situation.

23.     The issues in this case are not new issues for Defendants, the Harris County Jails have been the subject of litigation since 1972 regarding the inhumane conditions of the jail. *See Alberti v. Klevenhagen,* 46 F.3d 1347 (5th Cir. 1995) (latest case in a long line of cases involving inmates trying to force Harris County to properly manage and maintain the jail.) This lawsuit is in many ways a continuation of that litigation, Defendants seem to need to be reminded that the Harris County Jail must be properly funded and staffed in order to avoid the inhumane conditions the *Alberti* plaintiffs suffered as well as the shocking inhumane conditions currently being suffered by Plaintiffs in this case. Harris County has an obligation to properly fund the jail for the safety of the employees and the inmates.

## **FACTS**

**I.      Defendants have a ministerial duty to meet jail standards set forth by state and federal law.**

24.     The Texas Commission on Jail Standards (TCJS) sets minimum jail standards that must be followed by each county jail in the State of Texas. Tex. Loc. Gov't Code §351.002 (Each county jail must comply with the minimum

standards and the rules and procedures of the Commission on Jail Standards). Harris County has no choice but to follow and abide by the minimum standards set by the TCJS. The jail standards create affirmative actions that Harris County must make under the law. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989).

25.     The TCJS is charged with setting minimum standards for the care, custody and control of inmates held at county run facilities such as the Harris County Jail. *See* Tex. Admin. Code §251.1.

**II.     Harris County has a history of failing jail standards**

26.     Since 1972, Harris County has been failing to meet jail standards which has resulted in complex and costly ligation that has unnecessarily burdened the taxpayers of the county and caused harm to inmates and jail staff. *See Alberti v. Klevenhagen,* 46 F.3d 1347 (5th Cir. 1995).

27.     Harris County recognizes that staffing the jail is an essential function and not being able to staff the jail constitutes an emergency. Sheriff Tommy Thomas first declared an emergency under Tex. Loc. Gov't Code §157.022(b). Since, Harris County has continually functioned in a state of emergency in order to meet jail standards. *See* Sheriff Adrian Garcia emergency declaration letter (Jul 21, 2011) (declaration of emergency signed by Sheriff Adrian Garcia stating jail standards cannot be met without

declaring an emergency). The declaration of emergency is filed with Commissioners Court yearly in order to meet jail standards and staffing shortages. The Sheriff and the Commissioners – both past and present – acknowledge that they could not meet jail standards without declaring a state of emergency. No effort has been made by Defendants to remedy the situations that has led to the declared emergency. Even with the declared state of emergency, the Harris County Jail does not meet jail standards.

28.     Defendants know and are aware that Harris County cannot meet minimum jail standards. Defendants purposefully underfund and understaff the jail automatically resulting in an intentional mismanagement of the Harris County Jail facilities in such a way as to thwart their responsibilities to meet state and federal jail standards and knowingly putting the jail employees at risk without giving them proper notice or training. This conduct also has puts inmates at risk and harm resulting in increased deaths and injuries.

29.     Such willful acts by Defendants to chronically underfund and understaff the jail facilities, thereby not meeting minimum jail standards, constitutes an intentional abuse of power and a willful disregard for the substantive due process rights of their employees who Defendants have knowingly placed in shocking danger daily.

30.     On May 21, 2001, Harris County failed its annual inspection conducted by TCJS due to fire and life safety violations. TCJS Inspection Report, Inspector Shannon Herklotz, (May 21, 2001).

31.     On June 4, 2001, Harris County was ordered to repair or replace all the two-way communication devises provided for inmate to jailer communication throughout the facility as well as the smoke and fume removal system undentifief in a failed inspection. Harris County failed to comply with the TCJS order. Letter from TCJS executive director Terry Julian to Honorable Robert Eckels, (Jun 4, 2001).

32.     On May 15, 2002, Harris County failed jail inspection at the 1301 Franklin Street Jail (no longer utilized). The facility did not provide adequate two-way communication between inmates and jailers and had fire and life safety violations. Letter from TCJS executive director Terry Julian to Honorable Robert Eckels, (May 15, 2002).

33.     On May 30, 2002, Harris County failed jail inspection in the Criminal Justice Center Intake and Holding Area (IPC) for various reasons to include issues with fire and life safety. The facility could not be occupied until the issues were addressed. Letter from TCJS executive director Terry Julian to Honorable Robert Eckels, (May 30, 2002).

34.     On September 5, 2002, Harris County was notified that its jail facilities failed a comprehensive five-day jail inspection for numerous reasons to include, doors not having working locks, insufficient smoke detectors, and unsanitary flooding. TCJS Occupancy Inspection Report, Inspector B. Wood, (Sep 5, 2002); Letter from TCJS executive director Terry Julian to Honorable Robert Eckels, (Sep. 5, 2002).

35.     On May 26, 2004, Harris County was notified that its jail facilities failed a five-day comprehensive inspection conducted by TCJS inspectors. TCJS Occupancy Inspection Report, Inspector R. Biehle, (May 26, 2004). Harris County failed due to overcrowding, not meeting the mandated 1:48 ratio, and inadequate smoke detectors. *Id.* Harris County was ordered by TCJS to reduce the inmate occupancy of its dormitories in order to gain compliance, provide smoke detectors throughout the facility, and to increase staffing to supervise its jail population. Letter from TCJS executive director Terry Julian to Honorable Robert Eckels, (May 28, 2004).

36.     On June 21, 2005, Harris County was notified that its jail facilities failed a five-day comprehensive inspection conducted by TCJS inspectors. TCJS Occupancy Inspection Report, Inspector R. Biehle, (Jun 21, 2005). Harris County failed due to overcrowding and not meeting the mandated 1:48 ratios. *Id.* Harris County was ordered by TCJS to reduce the inmate occupancy of its

dormitories in order to gain compliance and to increase staffing to supervise its jail population. Letter from TCJS executive director Terry Julian to Honorable Robert Eckels, (Jun 21, 2005).

37.     In 2005, Harris County sought a population variance from TCJS to install 850 additional beds above its allowed capacity.[3] In a letter to the State Representative Rodney Ellis, TCJS Executive Director Adan Martinez stated that in 2005, Harris County sought a variance to add 850 beds to the three jail facilities while at the same time Harris County was in a staffing crisis and could not adequately meet the 1:48 ratio. TCJS Letter to Ellis. In 2005, Harris County was operating under a remedial order issued by TCJS that limited the jail population based on the available staff Harris County could provide. *Id.*

38.     On April 13, 2006, Harris County failed jail inspection and was cited for having overcapacity in pods, not having appropriate two-way communication between jailers and inmates, not drilling staff on fire and life safety, and not meeting the mandated 1:48 ratios. TCJS inspection report, Inspector Russell Biehle (Apr 26, 2006).[4]

---

[3] Brandi Grissom, *The Big House Isn't Big Enough, The Texas Tribune* (Aug 5, 2010) https://www.texastribune.org/2010/08/05/harris-county-seeks-permission-for-extra-jail-beds/; Letter to State Rep. Rodney Ellis from TCJS Executive Director Adan Munoz (Aug 3, 2010) https://static.texastribune.org/media/documents/Harris_County_Response_Letter.pdf.
[4] *Also see* Steve McVicker, *Harris County ordered to move inmates*, Houston Chronicle (May 4, 2006) https://www.chron.com/news/houston-texas/article/Harris-County-ordered-to-move-inmates-1852732.php.

39.     On May 4, 2006, TCJS ordered Harris County to send inmates to other

county jails because the Harris County jail could not meet jail standards of the

1:48 ratio for three years in a row. McVicker, *Harris County ordered to move*

*inmates*. Then Sheriff Tommy Thomas stated that there is a jail staff shortage

that led to the noncompliance. *Id.*

40.     Harris County operated with TCJS approved bed variances in 2006,

2007, 2007, 2008, 2009, and 2010. TCJS Letter to Ellis. Part of the rational

for the variances was to consolidate inmates in pods in order to reduce the

staffing needs throughout the Harris County Jail Facility. *Id.*

41.     In 2008, the US Department of Justice conducted an investigation on the

Harris County Jail under the 42 U.S.C. §1997b. The Justice department

concluded that the constitutional rights of detainees were violated and that the

Harris County Jail "fails to provide detainees with adequate: (1) medical care;

(2) mental health care; (3) protection from serious physical harm; and (4)

protection from life safety hazards."[5] The report specifically found that there

was not adequate training of detention staff to safeguard the civil rights of

inmates. *Id.*

42.     On April 20, 2009, Harris County jail facility was cited by TCJS and

ordered to reduce overcrowding in holding cells, and to ensure two-way

---

[5] United States Department of Justice (DOJ) Civil Rights Division, Letter to The Honorable Ed Emmett, (June 4, 2009)http://www.justice.gov/crt/about/spl/documents/harris_county_jail_findlet_060409.pdf.

communications were available at all times between a jailer and an inmate, ensure there is enough staff to supervise inmate work, as well as other violations. Letter from TCJS executive director Adan Munoz to Honorable Ed Emmett, (Apr 20, 2009); TCJS inspection report, Inspector George Johnson (Sep 3, 2009).

43.    In 2009, Harris County failed inspection by TCJS due to broken intercoms and toilets as well as holding cells being used well over capacity.[6] Executive Director Adan Munoz stated, "[a]n inmate should be able to press the intercom and communicate with the officer controlling the floor. When an officer cannot hear an inmate in need that is a life safety issue." *Id.*

44.    In August 2009, Harris County contracted with MGT of America, Inc. to "conduct a comprehensive assessment of staffing needs for the Detentions Bureau and portions of the Criminal Justice Bureau." *Staffing Study of Harris County Sheriff's Office Detention Facilities: Final Report*, MGT of American Inc., September 30, 2010. The report states "that there is an inadequate number of staff to perform critical operations and functions. Currently, HCSO compensates for the inadequate number of staff by having staff from all areas of HCSO work overtime in the jail facilities. While the use of overtime allows HCSO to comply with TCJS, the level at which staff are required to work

---

[6] Roma Khanna, *Broken toilets, intercoms cited in Harris Co. jail review*, Houston Chronicle (Apr 17, 2009) https://www.chron.com/news/houston-texas/article/Broken-toilets-intercoms-cited-in-Harris-Co-1619046.php.

overtime potentially creates conditions that severely hamper the efficiency and effectiveness of jail operations and may impair effective security for inmates and staff." It goes on to state "[m]ost of the jails currently manage inmate movement by pulling officers as required from other posts on the roster. This practice results in critical posts within the facilities being left understaffed or unmanned. The vast majority of there are posts responsible for housing unit supervision and their absence impacts the safety and security of the units and compliance."

45.     On September 4, 2009, Harris County jail facilities were cited by TCJS after a special inspection found the use of variance and temporary beds above the capacity granted by TCJS and noncompliance with medical orders. Letter from TCJS executive director Adan Munoz to Honorable Ed Emmett, (Sep 4, 2009); TCJS special inspection report, Inspector George Johnson (Sep 3, 2009).

46.     Major Mike Smith – the major over Harris County jail facilities – testified before the jail commission in August 2010. He stated that Harris County has "aggressively outsourced" about 1,500 inmates to other Texas counties and Louisiana in part due to overcrowding but also shipping inmates to other facilities costs the County less than it would to hire additional

personnel to work at the jail to accommodate a larger jail population and to cut the ballooning overtime budget.[7]

47.      On October 10, 2011, Harris County was cited by state inspectors for overcrowding and not meeting the **minimum** 1:48 ratio. Letter from TCJS Executive Director Adan Munoz to the Honorable Ed Emmett, Notice of Non-Compliance (October 10, 2011); TCJS special inspection report, Inspector Robert Green (Oct 10, 2011). Inspectors found twenty-five inmates in a cell approved for five inmates, seventy-six inmates in a cell designed for twenty-three, and only five jailers assigned to supervise 409 inmates as well as other overcrowding issues.[8] Sheriff Adrian Garcia stated that the conditions were due to staff shortages, and he has asked Commissioners Court for authorization to replace 300 open jailer positions. *Id.*

48.      On March 14, 2013, was cited by state inspectors for failing to adequately conduct inmate rounds. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (March 14, 2013); TCJS special inspection report, Inspector Anthony Mikesh (Mar 14, 2013).

49.      In 2015, State Senator John Whitmire called the Harris County Jail "unsafe and unhealthy" and Harris County's inability to prevent the spread of

---

[7] Brandi Grissom, *TriBlog: Harris County Jail Controversy to be Continued*, The Texas Tribune (Aug 5, 2010) https://www.texastribune.org/2010/08/05/harris-county-officials-talk-about-jail-crowding/.
[8] James Pinkerton, *County jail cited for dangerous overcrowding*, Houston Chronicle (Oct 10, 2011) https://www.chron.com/news/houston-texas/article/County-jail-cited-for-dangerous-overcrowding-2212138.php.

disease in the jail endangered inmates and the public.[9] Then Harris County Judge Ed Emmett stated that the Harris County Jail is like "a glass with a hole in the bottom […] It's not something you ever solve." *Id.*

50.     On March 11, 2016, Harris County Jail Facilities were cited for not providing adequate and timely medical care for inmates. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Mar 11, 2016); TCJS Special Inspection Report, Inspector Anthony Mikesh, (Mar 11, 2016).

51.     On March 21, 2016, Harris County Jail Facilities were cited for not providing adequate and timely medical care for inmates. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Mar 21, 2016).

52.     In 2016, then Sheriff Ron Hickman had to transfer money from HCSO law enforcement budget to cover jail overtime costs after the Harris County Commissioners Court rejected his request to hire 376 new personnel.[10] Sheriff Hickman stated in 2016 that the average jailer has only worked for Harris

---

[9] James Pinkerton, et. al., *Harris County Jail considered "unsafe and unhealthy" for inmates, public*, Houston Chronicle (Nov 21, 2015) https://www.houstonchronicle.com/news/houston-texas/houston/article/Harris-County-Jail-is-unsafe-and-unhealthy-for-6649163.php.

[10] St. John Barned-Smith, Skyrocketing overtime, burned-out guards plague Harris County jail, Houston Chronicle (Aug 28, 2016) https://www.houstonchronicle.com/news/houston-texas/houston/article/Skyrocketing-overtime-burned-out-guards-plague-9189697.php.

County for two years, that jail staff are being burned out because of staffing shortages, and overtime making it hard for HCSO to keep staff. *Id.*

53.     On February 21, 2017, Harris County facilities were cited by state inspectors for failing to conduct appropriate rounds on inmates. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Feb 21, 2017); TCJS Special Inspection Report, Inspector Jackie Benningfield, (Feb 21, 2017).

54.     On April 3, 2017, Harris County Jail facilities were cited by state inspection for not providing proper two-way voice communication between inmates and jailers, for not conducting proper rounds, and for not providing inmates food during a 24-hour period. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Apr 3, 2017).

55.     On December 19, 2017, Harris County Jail facilities were cited by state inspectors for not performing adequate rounds on inmates as required by law and was cited for being understaffed. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Dec 19, 2017); TCJS special inspection report, Inspector Wendy Wisneski (Dec 19, 2017).

56.     In 2018, an investigation found that overtime costs were ballooning for the Harris County Jail. Sheriff Ed Gonzalez stated that the issue comes from chronic understaffing and the jail was losing more staff than Harris County is able to hire.[11]

57.     On August 28, 2018, the Harris County Jail was cited by TCJS for not performing adequate visual checks on inmates. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Aug 28, 2018); TCJS special inspection report, Inspector Wendy Wisneski (Aug 23, 2018).

58.     On December 3, 2018, Harris County was notified that its jail facilities failed a five-day comprehensive inspection conducted by TCJS inspectors. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Dec 3, 2018); TCJS Inspection Report, Inspector Jackie Benningfield, (Dec 3, 2018). Harris County failed due to unsanitary conditions and improper food temperature. *Id.* Harris County was ordered by TCJS to ensure there is no trash and insects in inmate living areas, and they were ordered to maintain standards for food temperature. *Id.*

59.     On February 13, 2019, Harris County was cited by TCJS for not adequately notifying the magistrate of inmates with suspected mental

---

[11] Robert Arnold, Million spent on overtime at the county jail, Click2Houston (Jun 29, 2017) https://www.click2houston.com/news/2017/06/30/millions-spent-on-overtime-at-county-jail/.

disabilities or are potentially suicidal as required by Texas law. Letter from TCJS Executive Director Brandon Woods to the Honorable Lina Hidalgo, Notice of Non-Compliance (Feb 13, 2019); TCJS Special Inspection Report, Inspector Wendy Wisneski, (Feb 12, 2020).

60.     On December 9, 2020, Harris County was notified that its jail facilities failed a five-day comprehensive inspection conducted by TCJS inspectors. Letter from TCJS Executive Director Brandon Woods to the Honorable Lina Hidalgo, Notice of Non-Compliance (Dec 9, 2020); TCJS Inspection Report, Inspector Byron Shelton, (Dec 8, 2020). Harris County failed due to failures in classifying inmates, deficiencies in jail's clinics, and late rounds. *Id.* Harris County was ordered by TCJS to create plans in order to correct deficiencies and to install additional cameras. *Id.* Letter from TCJS executive director Terry Julian to Honorable Robert Eckels, (Jun 21, 2005).

61.     On January 6, 2021, Harris County hired Shannon Herklotz, former inspector and deputy director for TCJS as the assistant chief overseeing the Harris County Jail Facility.[12] Harris County Judge Lina Hidalgo hailed the hiring of Chief Herklotz and stated "Meaningful reform to our criminal justice system means taking stock of our entire system, from top to bottom. The

---

[12] St. John Barned-Smith, Hannah Dellinger, *Harris County Sheriff Appoints former state jail inspector to oversee jail*, Houston Chronicle (Jan 6, 2021) https://www.houstonchronicle.com/news/houston-texas/houston/article/Harris-County-Sheriff-appoints-first-civilian-to-15850883.php

responsibility of running a jail isn't simply about making sure people can't get out – it's about ensuring that processes are efficient and fair, that jail staff are safe, and that people leaving our custody leave at least as well as they came in." *Id.*

62.     On February 9, 2021, Harris County Commissioners (Defendants herein) unanimously passed a $3.3 billion dollar county spending budget for fiscal year 2021-2022.[13] The budget increased about 2% over the previous year's budget. *Id.* Roughly $2 billion dollars was allocated to the general fund. Harris County Proposed Budget 2021. By information and belief, overtime costs for jail employees were not factored into the budget for the Harris County Sheriff's Office although Defendants were well aware and had knowledge that the Harris County jail was seriously understaffed and underfunded and would accrue significant overtime costs, as it has in previous years. Defendants refused to address the deplorable conditions for staff and inmates in the Harris County Jail.

63.     On April 6, 2021, the Harris County Jail was cited by TCJS for not performing adequate visual checks on inmates. Letter from TCJS Executive Director Brandon Woods to the Honorable Lina Hidalgo, Notice of Non-

---

[13] Andrew Schneider, *Harris County Commissioners Approve $3.3 Billion Budget*, Houston Public Media (Feb 9, 2021) https://www.houstonpublicmedia.org/articles/news/politics/2021/02/09/391064/harris-county-passes-budget-for-2021-2022/

Compliance (Apr 6, 2021); TCJS special inspection report, Inspector Jon Luna (Apr 5, 2021).

64.     For twenty years, Harris County has been presented with significant evidence that its jails are failing and not meeting minimum jail standards, and yet, Defendants intentionally refuse to take any mandatory steps to fix the issues that is part of their ministerial duties. During this time period, chronic understaffing can be cited as the chief reason for Harris County's constant and consistent failures of minimum jail standards. Defendants will continue to turn a blind eye and ignore the significant and increasing dangers to staff and inmates in the jail and the horrific hostile and dangerous working conditions, unless Defendants are held accountable for failing to perform their mandatory duties.

**III.     Harris County has a mandatory ministerial duty in jail standards to protect staff, visitors, and inmates**

65.     Tex. Admin Code §260.101 states that "Facility security shall be planned to protect offenders from one another, protect staff and visitors from offenders, and deter or prevent escapes. The level of security shall be commensurate with the degree of security sought to be achieved." Harris County fails this jail standard.

66.     According to the Offenders Management System (OMS) statistics of reported jail incidents kept by the Sheriff's Office, there were 918 assaults on

staff members committed by inmates in the first eight months of 2021. Harris County Sheriff's Office OMS Violent Incident Disciplinary Statistics for January 1, 2021 – September 9, 2021. There were 6,352 assaults between inmates reported during that same time period. *Id.* These numbers are only the reported incidents.

67.     Employees of Harris County working in the jail facility are resigning/leaving in large numbers due to increasing safety issues they experience while working at the jail. Defendants' actions and omissions are inadequate to protect the employees who work in the jail from the inmates or the protect inmates from each other.

68.     John Doe 10 knows to be fact that inmate assaults on each other are increasing threefold in the last year. Assaults on staff have doubled in the last year. The inmate on staff assaults have gone up when detention officers go into the pods alone in order to do CorreTrak[14] rounds. In these assaults, there is no provocation for the attacks. They are mostly an inmate blindsiding a staff member while they go to scan the CorreTrak rounds.

69.     John Doe 35 states that staffing is so short that there are not enough personnel to protect staff from the inmates. For example, the DOs and personnel that deliver and change out the inmates' laundry are being assaulted

---

[14] CorreTrak is an electronic devise the size of a cell phone that is used in the Harris County jail to scan barcodes set in the inmate housing area to record and log rounds being conducted.

ever week because there is not enough people to form a presence during these times. Inmates are throwing urine and feces on the detention officers often and the inmates are fighting the DOs and each other. There is no control over the floors.

70.     Jane Doe 33 works as a nurse in the Harris County Jail with over twenty years of experience working in the jail. Based on her experience working in the jail clinics, she has observed that inmate on inmate assaults are on a significant the rise. She has treated inmates who have been jumped by multiple inmates and the injuries the inmates are sustaining are severe. Inmates are being treated daily after being assaulted.

71.     John Doe 34 states that the inmates know that everyone is spread thin and know when staff do the rounds. The inmates know when they can get at the DOs. There was a vicious assault on a DO in June where an inmate waited for the DO to come in to do rounds, waited for the DO to go into the back corner the farthest away from the door, and then went and attacked the DO without provocation. It is on video. The DO went to the hospital. He sees it often where DOs are being blindsided by inmates and being assaulted.

72.     John Doe 21 is a military veteran who was stationed in Iraq before joining Harris County. Due to military training, he learned to constantly be on guard. On one instance in August 2021, an inmate rushed him as he was entering the

door to do rounds.  Since John Doe 21 was behind the door and used the door

to prevent the inmate attack.  John Doe 21 managed to get the inmate to the

ground and hold him down until help could arrive.  He had to go into the pod

alone but was ok because of his specialized military training, most DOs do

not have sufficient training or experience to be able to protect themselves from

inmate attacks.

73.     John Doe 28 states that no matter what was happening on the floor,

Corretrak rounds were first priority. According to the rules or policies, staff

are not to enter the cells without another person at the door; however, due to

critical staffing shortages, a second person seldom ever around or available.

74.     Jane Doe 13 states she was working the 4th floor of 701 while she was

pregnant. Going into the pods alone to do rounds while pregnant made her

scared and uncomfortable. There were never enough people to partner up with

or to be available as backup.

75.     John Doe 20 resigned from Harris County as a detention officer in August

2021. "Toward the end it was pretty rough." The brass (supervisors ranked

above him) kept contradicting themselves, harping on safety but there was

never enough staff to work safely.  People went in cells by themselves every

single day.  It was an accumulation of things that made him quit, but one of

the main things was a female employee that was assaulted on his floor because

she was in the cell by herself.  CorreTrak was the main thing going on.  They could never use "staffing" as an excuse for the rounds being late.  When John Doe 20 took on more rounds than he could handle on time because there was not the staff to do rounds, he got reprimanded for being late on rounds and treated terribly.

76.      Jane Doe 31 states that more work has been created since they have moved male inmates onto the female floors because now there needs to be more escorts and rovers but there has not been an increase in staff. Harris County is just asking for trouble. The detention officers do not have control of the floors.

77.      Jane Doe 25 and Jane Doe 19 were formerly employed by the Harris County Sheriff's Office as detention Officers. In March 2021, the HCSO started to remodel the 7th floor of the 701 San Jacinto Jail. The 7th floor is a maximum-security floor for the facility. Though the HCSO stated that for security reasons, the floors under remodel would be cleared, Harris County forced the remodel to continue while inmates were still housed on the floor. While remodeling 7G pod, the contract construction workers were allowed to prop open the security doors so they could freely move in and out of the pod in order to do work. G pod is an open dormitory with approximately 50 inmates. The inmates were able to freely move throughout the pod during the

construction. There was no effort made to account for the worker's tools and supplies due to staff shortages. During this time, the pod control detention officer could not control the pod doors because the contractor removed the electrical panel in the pods. The removal of the control panels also removed the detention officer's ability to communicate with the Floor Control Center, (FCC[15]), supervisors, and other employees in case of emergency creating dangerous conditions for both staff and inmates. Employees were issued radios which had spotty reception inside the concrete structure. The electrical panels were removed for at least a month and in some cases longer before they were replaced, and the detention officer could gain full control of the pod. There were several occasions where inmates, including mental health inmates, would exit the door propped opened by the workers and be free to walk the halls without permission or escort. This situation led to unnecessary confrontation between employees and high security inmates.

78.     John Doe 14 states that the last time the cameras were installed at 701, the whole floor was shut down and there was no one on the floor so that the installation could go on without interruption; however, Harris County has chosen to have contractors inside the cells with inmates while having an

---

[15] The Floor Control Center monitors all pods and cameras on a jail floor. The FCC has override control over all the doors and control mechanisms on the floor. It also monitors the secured entrance into the inmate secured side and controls the doors from the unsecured side to the secured side. It also serves as the floor dispatch center for emergency protocols.

officer as an escort during this current camera upgrade. The pod officer is in the safety vestibule with a handheld radio that runs out of battery quickly and there is no way to know the battery is out until you use it, and it does not work. Then when the radio is dead, there is no way to call for help.

79.     John Doe 11, Jane Doe 4, Jane Doe 3, and John Doe 2 state that civilians are not being escorted when they go into the secured areas and that civilians, including nursing staff, are having to deal with inmates without any security from deputies or detention officers. All state that there is not enough staff to break away from other functions in order to escort civilian workers.

80.     John Doe 10 is a jail supervisor. He states that per training, civilians must be escorted into the secure side of the jails, to include the maintenance contractors. Due to staff shortages, the maintenance contractors are commonly let into the cell blocks by themselves without escort. It is important for them to have an escort in order to 1) keep the inmates from taking and accessing the tools the maintenance workers carry around and 2) for their own safety.

81.     Jane Doe 35 is a licensed nurse with Harris County. On or about July 27, 2021, Jane Doe 35 was walking through the clinic holdover area when an unescorted inmate stepped in front of her.  She moved to her left and the inmate moved in front of her again.  She tried again to move around the inmate but each time he stepped back in front of her, intentionally prohibiting her

from passing. Then the inmate moved behind Jane Doe 35 and put his arm around her neck in a choke hold with his elbow in line with the front of her neck.  Prior to the pandemic, Horace Strand taught nurses some basic self-defense moves, including how to get out of a choke hold.  He did this on his own and not at the direction of Harris County. Based on what she had been taught, Jane Doe 35 used both hands to pull the inmate's arm down and called for help. There used to be three detention officers assigned to that area; due to understaffing, on this date there was only one and he was behind the desk. That detention officer responded as the inmate was trying to take Jane Doe 35 to the floor.  The first detention officer called for another, and the two of them managed to get Jane Doe 35 away from the inmate. Jane Doe 35 had some redness on her neck where the inmate grabbed her and suffered some pain, but nothing permanent.

82.     Jane Doe 33 is a licensed nurse. She has worked in the Harris County Jail facilities for over two decades. When there is a medical emergency identified in a cell block, the medical staff will run a stretcher and other needed medical equipment to the cell block to respond. Presently, nurses are having to make stretcher runs without detention officers to escort them because there are no detention officers, deputies, or sergeants available. The inmate floors are commonly understaffed. Drug use in the jails has

significantly increased which has led to an increase in medical emergencies due to drug use. Jane Doe 33 has witnessed this increase first-hand. On one recent stretcher run, two nurses were transporting an inmate who had overdosed smoking K2 in the cell block.[16] She knows based on her medical training and seeing the types of cases the clinic receives every day, that drug use is on the rise in the jail facility. Some inmates who overdose on K2 can be overly aggressive, hallucinate, and or suicidal thoughts as well as ill reactions attributed to the toxic effects of the drugs. The overdosing inmates will often lash out at the medical staff and react violently. On one stretcher run, Jane Doe 33 and another nurse were transporting an overdosing inmate off the floor to the clinic via stretcher. The inmate suddenly rose up from the stretcher and went to attack the nurse pushing the stretcher at his feet, thereby blindsiding the nurse. Jane Doe 33, who is an older female, tackled the inmate in order to prevent him from striking the other nurse. There were no detention staff available to escort the medical staff on this stretcher run so no security was there when the inmate became violent. There is not enough security to protect the medical staff. Altercations are up, the inmates are fighting more and creating more trips to the clinic for these inmates.

---

[16] K2 is a synthetic marijuana that is a combination of dangerous toxins to simulate marijuana.

83.     Jane Doe 37 is a nurse employed by Harris County. She states that there
are rarely enough personnel for the security of the medical staff. When she
goes to a floor, there are often inmates without escorts right at the elevator
doors. When nurses are assigned to take the medication cart to floors, due to
the nature of the medications being distributed, it is essential for the
medication carts and nurses to remain secure. Often nurses assigned to
perform this assignment have to wait in order to distribute medications due to
the lack of detention officer staffing to escort the nurses to the floors and to
also remain with them until distribution of the medications to patients has been
completed. This causes delay in care to the inmate and at times they do not
receive their medications as scheduled by the prescriber. Nurses have had to
wait as long as a couple hours for an escort. She states that there are times
when medical staff need to respond to medical emergencies on inmate floors
but there are not enough detention officers to meet and escort them to the
emergency location. It is not a good situation and causes delay.

84.     John Doe 33 has been employed as a medical technician at the 1200 jail.
On September 27, 2017, the on-duty nurse practitioner ordered a skull series
x-ray on an inmate.  When the inmate came out of the holding cell he was
agitated.  John Doe 33 explained to the inmate he was there to help him, and
the inmate appeared calm down and the inmate was taken to the x-ray room.

The technician, the sole employee in that immediate area, was unable to leave the door ajar because of possible radiation exposure. John Doe 33 tried to put a stool in the door following the procedure, but the inmate kicked it away and threw the technician toward the x-ray console. The technician attempted to go toward the door, but the inmate pushed him back, then put him in a full chokehold with one arm around his neck and the other used to increase pressure on the first. The technician was able to free his right hand and use it to choke the inmate's neck, then move away from the inmate and call for help. The inmate managed to get on top of the technician and use his forearm to choke him again. The technician managed to kick the x-ray door, hoping someone would hear him. The technician believes the inmate intended to kill him. A nurse heard the ruckus and called for help. A sergeant and another deputy forcefully removed the inmate's arm from the technician's neck. The technician lost consciousness before the inmate's arm was removed, his face was swollen, and he regained consciousness on a stretcher. He was taken by ambulance to Memorial Hermann Hospital. The technician sustained major damage to the capillaries nears his eyes and cheeks which burst due to the intense pressure. He experienced hoarseness at least 5 days after the incident.

85.     Jane Doe 47 is a civilian working in detentions for federally funded grant programs. Though policy dictates that all civilians must be escorted while in

the secure area or while counseling inmates, she is routinely told that due to staffing shortages, there are no detention officers or deputies available to escort civilians in the secured facility. Understaffing can significantly delay her ability to achieve the goals of the federally funded grant programs. One day in the summer of 2021, she was counseling a group of inmates in the secured area of the 1200 Baker Street Jail. She was scheduled to counsel these inmates at this set time, and it was known by the facility that she would be meeting with these inmates because these inmates had to be released from their housing and, in cases, escorted to this meeting room. On this day, the facility went into a voluntary lockdown in order to conduct drug searches using a trained police canine. Though it was known that she was a civilian alone in a room with approximately 10 male inmates, the facility did not inform her to leave the room but, instead, she was locked in the room with the male inmates. Jane Doe 47 called her supervisor and called for assistance. No detention officer or deputy was allowed to come and release her because the command staff had ordered a building freeze (meaning no movement in the building) while the police canine was on site. Jane Doe 47 was able to leave the room after a significant amount of time. When she left the room, she was ordered to go back into the room by a detention supervisor. She refused the order and stated that it was against policy to lock her, a civilian, alone in a

room with inmates. The supervisor stated that the order came from the Chief and that she had to follow those orders and maintain the building freeze. After this incident, Jane Doe 47's supervisor, also a civilian, contacted the detentions command staff via email to protest that the social workers employed by Harris County were placed in unsafe conditions daily and that Harris County policy was not being followed concerning civilian employees and escorts. The command staff later stated that there were staffing shortages throughout the Detentions Facility and there were not enough staff to follow policy and escort civilians.

86.     Jane Doe 44 as a supervisor of civilian employees at the jail facilities has brought up the issues of civilian safety to the command staff. Floor supervisors have told her that there is not enough staff to escort civilian workers and not enough staff to escort the inmates. This is a huge safety issue, and she has sent several emails and tried to schedule meetings about the issue but has not received any answers or solutions to the problem.

87.     John Doe 5 states that the jail population has changed in the last couple years. Due to bond reform, the inmates that are in custody are there for higher level felony crimes. It is so bad it is hard to find inmates that qualify as inmate workers. Previously, those charged with murder and other high level violent crimes would only be on the maximum-security floor but now they are being

classified into general population. When you go on the floor, you do not know what you will encounter. Daily incident reports show that inmate-on-inmate fights and inmates being jumped by other inmates result in inmates having to be transported to the hospital. These accounts are all sent out in the Significant Event Bulletins (SEBs) that are created each day. Those bulletins show that inmate on inmate assaults are on the rise and that inmate attacks on staff are shockingly common.

88.    Defendants have access to the SEBs and are aware or should be aware of its contents.

89.     Jane Doe 2 is concerned with employee safety in the processing areas of the JPC.  The JPC was designed with an open concept where inmates sit in a large area until they are called to a desk for processing.  There are no doors or barriers between staff and inmates and the staff is greatly outnumbered especially with the current understaffing. The administration seems to take the attitude that because nothing has happened yet due to the acute personnel shortage, so everything is working properly but it is a concern to the people who work there every day as an obvious dangerous condition.

90.    Jane Doe 12 states that the JPC can be very unsafe when it is understaffed. It was not designed to function understaffed. When the JPC first opened the staffing plans called for many more people to work the different stations in

JPC than what JPC is working with right now. At times there is just one person doing the job of five because of understaffing. It is dangerous. In the first week of September 2021, an inmate was being booked into the JPC and jumped over the counter in order to fight a DO. Fortunately, at that time it was shift change and both shifts were present to handle the situation. If it had not been shift change, the staff would have been overwhelmed. The jail needs help. Something has to change quick because she does not know how much more people can take. They do not feel that anyone cares about their safety and well-being.

91.     John Doe 21 is assigned as a detention officer in the JPC. He is concerned that there are not enough people to make the areas safe.  Sometimes there are only two people working an area and they are behind a desk and unable to rapidly respond.  To do their jobs, DOs must focus on computers and paperwork and cannot always focus on the inmates who are in the open concept seating. When DOs are AFISing inmates their attention is taken away from the others in the area and these inmates can get very hostile.  If there is a confrontation with one inmate, the others can get amped up and the staff is badly outnumbered.  Rovers are needed in the open seating areas to watch the other inmates, keep males and females from talking, and just to have an extra body.  There is not enough staff lately to have those extra bodies.

92.    Jane Doe 19 was formerly employed by the Harris County as detention Officer. In March 2021, the HCSO began renovations of the 7th floor of the 701 San Jacinto Jail. In early March, the construction contractors were working in the single man cells in C pod on the 7th floor. The contractor was installing cameras inside the single man cells. The contractor did not finish the install before he left work for the day but the inmate who was housed in the cell had to be placed back for the night. The inmate was able to take a part the unfinished camera casing and make "shanks" of the material.[17] It was common for inmates to pick up discarded screws left by the construction contractors and sharpen the material to use as weapons.

93.    Jane Doe 45 is a civilian and states that when she was hired about a decade ago, civilians were trained to not get on the elevator without an officer or deputy present and the policy has gotten laxed and laxed as the years have passed because there is just less and less people. She has been on the elevator alone and then many inmates will get on and she will have to get off because of the danger to her as there are no escorts. The elevators are always an issue. They never seem to work properly. She has had it where the door is jammed three days a week out of the five days she is works. She has been on the elevators when the operators cannot open the doors. There were two officers

---

[17] A "shank" as used in this complaint, is a handmade weapon fashioned by inmates out of material found or stolen within the jail.

and an inmate on the elevator with her and it took about ten minutes. She does not get on the elevator now with unescorted inmates at all because untreated and unsupervised the mental health inmates are running loose much more. There are so many of them that they are in the general population. Too many inmates are walking around unescorted, and it is dangerous.

94.     Jane Doe 46 was on the elevator and there was a civilian and an unescorted inmate. The elevator stopped on three and the civilian got off. The elevator stopped and another unescorted inmate was going to get on. Jane Doe 46 said no, there is already an inmate on and asked for the inmate to not get on. She did not want to be outnumbered on the elevator. Neither inmate had an escort. The remote elevator operator told her no through the intercom, the inmate is going to get on and said that she needed to get off because the inmate was ordered to get on. The elevator operators run the elevators remotely and watch the cameras in the elevator. Jane Doe 46 does not feel there is any regard anymore for the staff's safety.

95.     Jane Doe 4, Jane Doe 3, John Doe 10, and John Doe 3 are all jail supervisors employed or formerly employed in the jail. On a daily basis, Harris County houses mental health inmates throughout the facilities. There is not enough space to house all the designated mental health inmates on the floor areas that are set up to house mental health inmates. Due to this, the

mental health inmates are housed in general populations. The staff that now supervise the mental health inmates housed in general populations are not given additional mental health training that detention officers and sergeants are given that work the designated mental health pods. Due to this, the detention officers and sergeants that respond inmates in general population that have mental health crisis are injured at a higher rate than when responding to incidents involving non mental health inmates.

96.     Jane Doe 4 states that when there is an inmate on the floor that is showing signs of mental distress, as a supervisor she would call the mental health unit (MHU) for a psychiatric evaluation. There have been numerous times when MHU states that they already are aware of that inmate; however, they do not have an opening for him in MHU, so he was placed in general population.

97.     John Doe 1 states that on a daily basis, inmates with obvious mental issues are mixed in the general population because there is not enough space to house all the mental health inmates in the areas designated for them, and mentally ill inmates are not distinguished from other inmates. Staff members, then, who have not received mental health training are left to deal with these particularly troublesome, and often dangerous, inmates. Many of the injuries employees suffer are at the hands of mentally ill inmates.

98.     John Doe 9 states that inmates that are exhibiting clear signs of mental illness are not being segregated and treated. They are being placed in the general population without any indication about their condition or potential volatility. This has resulted in rising inmate on inmate assaults as well as inmate on DO assaults. There is insufficient staff to create safeguards for the staff and to protect the inmates from each other.

99.     John Doe 29 writes a lot of psych reports because inmates throw or drink urine or show other obvious signs of mental illness.  The lack of adequate personnel or training creates unsafe conditions especially when dealing with these inmates. He has only worked as a detention officer for less than a year and has not completed his training but supervises these inmates by himself.

100.    Jane Doe 21 states that she encounters inmates with obvious mental illnesses housed in general population because the mental health unit has no empty beds.  Jane Doe 21 has very limited mental health training but is not paid the additional mental health stipend that comes with the additional training received by MHU DOs due to the increased risk.

101.    Jane Doe 17 states that detention officers are not supposed to go into a cell alone, but everyone does because there is no backup with staff shortages. When DOs call for assistance due to a fight, it takes a long time for rovers to come.  In mid-August 2021, an inmate bit Jane Doe 17's finger. There were

only two rovers and a new trainee on the floor that day. Jane Doe 17 got a tetanus shot and had to take medication for 30 days to prevent the possibility of a blood-to-blood exposure.

102.     Jane Doe 1 states that every area of the jail is running on skeleton crews with little work being able to accurately be completed. Inmate disturbances are on the rise. A lot of incidents go unreported because there is just not enough time to complete all the paperwork needed. The floor sergeants have to act as DOs and the lieutenants have to act like sergeants just to get the bare essentials of the job done and a lot falls through the cracks. There is not enough people with the current staffing shortages to get the job done.

103.     Jane Doe 49 states that on August 11, 2021, a man holding a gun in one hand and a magazine in the other came into the public bonding lobby of the JPC. He was covered in yellow caution tape and was waving the gun in the air. A deputy should always be stationed in the public lobby; however, that deputy position is always being rotated out because the JPC is so short staffed on deputies. Often the deputy is working overtime from another area and is not familiar with the lobby or other duties of that assignment. On this day, the lobby elevators that take the magistrate court staff to the second floor was down and the staff was stuck in the bonding lobby for about an hour. Due to the lobby being open to the public, it is essential for the security in the lobby

to be prioritized but often deputies are pulled from lobby security to do other duties in the JPC, creating a dangerous situation. There have been many times on night shift that there is no deputy present, even though the bonding lobby is open to the public 24 hours. Even after the incident with the gunman entering the lobby, there was no deputy stationed as security in the lobby on the night of August 28, 2021, because the JPC was so short staffed, the post is not considered essential.

104.     John Doe 5 states that there is a staffing shortage for certified peace officers to do hospital runs. Inmates that are sent to the hospital must have armed deputies escort them. Some inmates, due to their history, must have two deputies escorting them. The staffing is so low that deputies are being pulled off the housing floors to escort inmates from the hospital and deputies who serve as bailiffs in the courts are now being used. Deputies are being pulled from their regular duties and those other duties are not getting done. For example, on August 13, 2021, on the overnight shift, thirty-one certified deputies went out on hospital runs with inmates and or were at various hospitals with inmates and needed to be relieved. Centralized staffing was scrambling to find certified deputies on assignment to pull in order to send to hospitals to relieve staff guarding inmates.

105.     John Doe 35 states that the staffing of peace officers to make hospital runs has been terrible. Daily now the hospital runs need about forty deputies. There are not that many dedicated personnel for this purpose and deputies are being pulled from other places. There is a lot more hospital runs now than there were a year ago. On several occasions, including in the last weeks of August 2021, there have been inmates waiting for hours to go to the hospital after a doctor ordered that they be sent out. Inmates that have swallowed foreign objects like screws and razors have had to wait hours for a deputy to be available to escort them to the hospital. On one occasion on or about the last week in August, five inmates were waiting for deputies. The last inmate was sent to the hospital after waiting five hours.

106.     John Doe 12 is a certified peace officer. In the last week of August, he was sent to stay with inmate prisoners at the hospitals four of his five nights, though that is not his regular assignment. He returned to work after his regular days off and was sent to a hospital again on September 1, 2021. Often, he cannot get a deputy to relieve him to use the restroom on these assignments because there are too few personnel. In cases of emergency, he uses the inmate/prisoner's restroom in the room. He was the last deputy relieved twice one week in August, so he had to work past the 16-hours permitted by policy each night. He was relieved late again on September 3, 2021. On the days he

works past 16-hours, he only got two or three hours of sleep before having to return to work. One day last week he was sent to relieve a floor sergeant who was sitting with a prisoner because there were not enough certified deputies.

107.     Jane Doe 6 is a certified peace officer. She maintains that she and her peers are working in unsafe conditions while there is an acute personnel shortage. Since she is a peace officer, they routinely send her to guard inmates at various hospitals where they are being treated. Inmates charged with murder, aggravated assault on a public servant or similar offenses, or inmates with altered mental status, are supposed to have a **minimum** of two deputies with them; but with the understaffed personnel shortage, there is often only one. On one occasion about two years ago, an inmate with an altered mental status tried to disarm her partner. It becomes more dangerous when they work 16-hour shifts and are tired and less attentive. When she works a 16-hour shift she only gets about three and half hours' sleep before she must get up to go to work again. There are not enough personnel to get breaks to eat or use the restroom on 16-hour shifts.

108.     On July 14, 2021, an inmate being escorted in Ben Taub hospital tried to take the gun of the deputy that was escorting him resulting in the deputy

being shot in the hand.[18] The deputy did not have any backup and he was helped in subduing and handcuffing the inmate by hospital staff. Fortunately, the inmate failed in the escape attempt.

## IV.   Harris County must provide a sufficient number of jailer stations for each floor that inmates are housed to include staff restrooms

109.     Tex. Admin Code §260.118 states "A sufficient number of jailer stations shall be provided on each floor where inmates are housed. Staff toilets and lavatories should be provided in close proximity to jailer stations." Harris County does not meet this jail standard.

110.     Though under Texas Law the guidelines of the Occupational Safety and Health Administration (OSHA) does not apply to Harris County, federal law does state that employers are required to provide workers with prompt access to clean restrooms. "The sanitation standard is intended to ensure that employers provide employees with sanitary and available toilet facilities, so that employees will not suffer the adverse health effects that can result if toilets are not available when employees need them." Interpretation of 29 CFR 1910.141(c)(1)(i): Toilet Facilities, Memorandum to OSHA's Regional Administrators, U.S. Department of Labor: OSHA, Compliance Programs, April 6, 1988; *See* 29 CFR 1910.141. "Toilets that employees are not allowed

---

[18] Deven Clark, *Inmate involved in shooting that left HCSO deputy injured at Ben Taub has been identified: HPD*, Click2Houston (Jul 14, 2021) https://www.click2houston.com/news/local/2021/07/14/hcso-deputy-shot-in-hand-inside-specialty-clinic-at-ben-taub-after-prisoner-grabs-gun-during-attempted-escape-officials-say/

to use for extended periods cannot be said to be 'available' to those employees." *Id.* "Timely access is the goal of the standard." *Id.* These standards are set in order to protect workers from health complications that can occur when a bathroom is not readily available such as bladder problems, bowel issues, and urinary tract infections. *See* 29 CFR 1910.141.[19] While OSHA may not be directly applicable in this case, it is informative on what is considered basic sanitary standards for most workplaces.

111.     The Harris County Jail cannot appropriately staff the jail, causing understaffing throughout the jail complex. This leads to employees being left locked inside inmate observation pods without breaks for multiple hours even after calling for breaks and begging for the opportunity to take bathroom breaks. The pod control must be occupied 24/7.

112.     John Doe 1 states that employees have complained to him that they eat their meals in their pods because meal breaks and restroom breaks are more difficult or impossible to get. Harris County does not provide DOs breaks when they work 12-hour shifts to include no meal breaks. Employees only get breaks if another employee is available to relieve them, which with staffing shortages, does not happen with any frequency or consistency.

---

[19] *Also see Restroom and Sanitation Requirements*, United States Department of Labor, https://www.osha.gov/restrooms-sanitation; OSHA Restroom Break Laws, OSHA Education Center, 2021, https://www.oshaeducationcenter.com/articles/restroom-breaks/.

113.     John Doe 11 states that the bathroom facilities for the staff are substandard. On the 7th floor, the only restroom available was down for a week. On every floor, only one restroom for each gender on the secure side that is available for the detention staff. There is an additional restroom, one for each gender on the unsecure side.

114.     Jane Doe 15 states that on August 22, 2021, she called for relief to use the restroom and a rover came to relieve her. After some rovers went home at 3:00 pm, Jane Doe 15 called again for a restroom break and there was no one available to relieve her. The rovers were held over from another shift and had reached their sixteen hours max hours for a day. This made the floor short on staff for the rest of the shift. As she has many times before, Jane Doe 15 crawled under a desk, covered herself with a plastic bag so she could not be viewed on the pod control center's (PCC[20]) camera, and urinated in a different garbage bag. She states that it didn't used to be this bad all the time, but it has gotten worse. When Jane Doe 15 was pregnant several years ago, rovers would always come in a timely fashion to relieve her when she called. Currently, they may or may not respond now. She has relieved herself in a plastic bag many times while working in a pod out of desperation. These

---

[20] The Pod Control Center (PCC) is a room with windows that look into inmate dormitories and cells where detention officers can have direct supervision on inmates yet be separated from them. A PCC must be manned 24 hours a day and a detention officer is barred from leaving the PCC for any reason unless they are relieved by another qualified staff member. If they leave the PCC without relief, the detention officer will be terminated.

unsanitary conditions the DOs work in are ignored. Jane Doe 15 believes now she has a bladder infection but has not had time to visit her doctor because the 12-hour shifts five days a week do not give her enough time to take care of her family and herself. Again, on August 23, 2021, Jane Doe 15 called for restroom relief; none came, and she resorted to urinating in a garbage bag again as she covered herself with another garbage bag.

115.    Jane Doe 3 reports that because of the staffing shortages that she developed multiple bladder infections due to having to hold her bladder for too long. She reports that she knows of at least two DOs that were not given bathroom breaks and urinated on themselves. Both DOs that were forced to urinate on themselves quit soon after due to the working conditions.

116.    Jane Doe 13 stated that it was very hard to get bathroom breaks even though everyone knew she was pregnant. There was only one person relieving people on the whole floor and you had to wait a long time for that one person to come around. There are never enough people to get all the work done.

117.    Jane Doe 25 is a former detention officer employed by Harris County. She states that she could not go to the bathroom because of the staff shortages. She worked in a PCC and was barred from leaving her post. Jane Doe 25 had been undergoing treatment for her kidney cancer. She informed her supervisor of her condition that she had to be able to use the bathroom because of her

cancer treatment. Jane Doe 25 agreed to return to regular work hours during and after her cancer treatment on the promise that she would be given adequate bathroom breaks; however, she was not allowed to have a bathroom break because the floor was short staffed.

118.    John Doe 3 states that detention officers often complain about being left in the pods and not receiving restroom breaks. One detention officer had to wait one and half hours in the pod after asking for a restroom break before being given one. Complaints have been filed to the county regarding the issue, but nothing has been done about it.

119.    Jane Doe 22 states that prior to going on maternity leave, she had to work at least two 16-hour shifts a week; later that changed, and she worked five 12-hour shifts. At work she often could not get relief to use the restroom, or after her baby was born, to pump her milk. On one occasion she started calling for a rover to relieve her at 9:00 am and relief did not arrive until nearly 6:00 pm; that was extremely painful. When emergencies happened in the jail, it could take a long time to get relief, and Corretrak round came first before anyone got relieved. Knowing it is difficult for rovers to relieve people in the pods, she limited herself to calling for relief to twice a day. When the employees enter the cell to do Corretrak rounds or count there is supposed to be another employee at the door, but they are not.

120.     Jane Doe 7 states that frequently DOs assigned to pods do not get personal breaks or even bathroom breaks when they request such relief. She states that a female coworker urinated on herself when she could not get relief from the pod. That detention officer quit after the situation. The majority of detention staff cannot get breaks and they have been close to urinating on themselves. Jane Doe 7 states that she has been close to urinating on herself on a number of occasions when she had called for relief for a number of hours. She recalls one occasion where she had to wait six and half hours after calling multiple times for a bathroom break. The average wait time she sustains on a weekly basis is three and a half hours.

121.     Jane Doe 17 states that on August 18, 2021, she called for restroom relief three or four times, and it took two hours for someone to relieve her.

122.     Jane Doe 54 is normally assigned to work in the JPC but throughout August she has been assigned to staff in 701 jail because they are short staffed. While in a pod in 701, she called for and could not get anyone to relieve her for a break.  She was on her menstrual period and got blood on her clothes with no way to clean up.

123.     Jane Doe 26 has worked for the Harris County Sheriff's Office for 25 months.  On August 23, 2021, Jane Doe 26 left her assignment on the 3rd floor

to relieve another employee assigned to the 4th floor who otherwise could not get relief to use the restroom.

124.     John Doe 29 has been employed at the 1200 jail for the past 11 months. On August 20 or 21, 2021, all the rovers were tied up and John Doe 29 had to wait two hours to get relief to use the restroom.  When John Doe 29 gets relief, he is usually gone from his pod control center for less than the five minutes it takes for him to urinate or heat his food and return.  He eats his food in his assigned pod control center.  Other staff members do not like to work the 4th floor of 1200 because there are not enough rovers, and the floor is too busy. It is a high workload because the 4th floor primarily houses female inmates with some male inmates housed there also.  Female inmates must be kept separate from male inmates and escorted each time they need to leave the floor. This demands a lot of rovers to be assigned to the floor but there are never enough rovers assigned.

125.     John Doe 32 started work at Harris County on July 5, 2021. He is an army veteran and served in Iraq.  On one occasion after calling for rovers two or three times, he could not get relief to use the restroom for two hours. Finally, after he wet his pants and then urinated in a cup, a rover came to relieve him, but it was too late. He resigned on August 20, 2021. He just could not take the work environment and he did not want to put his life at risk.

126.     John Doe 31 has only worked for the Harris County Sheriff's Office for a month and a half. His experiences are that he cannot get adequate relief to use the restroom two out of a normal 5-day work week.

127.     Jane Doe 21 states she often has problems getting relief to use the restroom. On August 24, 2021, on the fourth floor, for instance, there were only seventeen people assigned to work her floor when there should have been twenty-one or more, and three of those assigned that day were unqualified trainees. When the available rovers are conducting cell searches, or there are a lot of personnel off the floors in the clinic or elsewhere, it is difficult to get restroom relief.

128.     Jane Doe 16 states that like most employees assigned to the 1200 jail, she has difficulty getting relieved to use the restroom. When she makes floor-pages and no one responds, she pages again 15 minutes later, then repeats the page until someone relieves her, sometime 45 minutes or more after the first page, and sometimes only when she says her need for relief is an "emergency." Sometimes when staff members are conducting cell searches, she calls the cell where the search is going on and asks one of them to relieve her, but that does not always work. She has called the sergeant who promised to send someone but does not always follow through due to the understaffing.

129.     Jane Doe 20 states in September or October of 2020, while she was pregnant, she asked repeatedly for a restroom break.  She had made six or seven pages, and no one responded for more than an hour.  Another female detention officer was also making multiple floor pages for a restroom break. Jane Doe 20 called the FCC and was told the rovers were off the floor; so, she made a building page. The sergeant called her on the phone her she should not have made a building page but should have called her office instead. Jane Doe 20 had, in fact, called the sergeants' on duty but no one answered as they were all busy. Not being able to get reasonable restroom breaks is not uncommon, in part because the employees have all been told by supervisors and in emails that CorreTrak rounds are most important and come first, even before responding to a use of force.

130.     John Doe 13 is normally assigned to work the FCC on his floor. When he hears calls for restroom breaks, he calls two-man pods and tries to get one of them to give that person a break.  If the person leaves the two-man pod, the pod could be out of compliance but there was no choice. CorreTrak rounds take precedence over everything else and if the rounds are late someone gets written up so breaks have to wait.

131.    Jane Doe 14 states that on August 23, 2021, she was assigned to work the FCC and she had to repeatedly tell co-workers that there was not a rover available to give them a bathroom break.

132.    Jane Doe 11 states there are times when she does not get a meal break and has difficulty getting relieved to use the restroom. When she calls for a break, she is sometimes told she cannot be heard; other times she is told not to yell. Jane Doe 11 recently underwent surgery for a female issue and has not fully recovered yet. On or about Wednesday, August 11, 2021, she was unable to get restroom relief though she was bleeding because of her recent surgery. By the time she got relief, her pants were soiled, and she wanted to leave work to clean herself and get clean clothes. Her sergeant did not prevent her from leaving per se but told her, "See if you can stay," or words to that effect because the floor absolutely needed her. Jane Doe 11 felt nasty and uncomfortable but cleaned herself as best she could and remained at work. A different supervisor has told her CorreTrak rounds were more important than restroom breaks.

133.    Jane Doe 31 works as a detention officer in the jail and she has a hard time being relived for breaks because there is not enough staff on the floors. She has told her supervisors that it is very important for her to get relieved because she has very heavy menstrual cycles that are painful. Despite this she

cannot get relieved and monthly will bleed through her clothes. When this happens, she is told by her supervisors to go home and change her uniform and come back to work. She has asked to be transferred to a floor that is not as busy so she can get more timely relief during her monthly cycles but that was denied because there is not enough staffing anywhere. Now in order to avoid the embarrassment of begging people for a bathroom break, bleeding through her clothes, and not being able to have adequate menstrual hygiene, she is forced to call in sick on her menstruation days pursuant to her doctor's orders. Her supervisors get mad about her calling in sick, but she feels she has no choice. It has gotten so bad with restroom breaks that detention officers are paging for rovers through the whole building to find someone available to relieve them in a pod.

134.     Jane Doe 32 normally works a one-man pod and has problems getting a rover because of the short staffing.  It normally takes an hour if it is a slow day and occasionally takes up to three hours to get restroom relief.

135.     John Doe 8 states that a female came to his office on August 30, 2021, and said she had to wait two hours for a restroom break. She may only get one break a day on her 12 hour shifts and only after making multiple calls to the sergeants' office.

**V.     Harris County must provide adequate medical facilities but due to staffing, the jail clinics and medical care do not meet jail standards**

136.     The Harris County Jail has a population of approximately 9500 inmates. Harris County is required to provide adequate medical facilities for the care of the inmates, to include staffing of medical personnel; however, Harris County is failing and refusing to provide adequate staffing in order to provide proper medical care to the inmates. *See* Tex. Admin Code §273.2.

137.     Jane Doe 33 knows that Harris County has lost a lot of nurses and medical staff from the jail who have quit because of safety issues that occur due to inadequate staffing. It has been documented in their resignation paperwork. Presently, there are not enough nursing staff to work the clinics. The nurses are running on a skeleton crew. Even with the County bringing in temp medical staff, they still cannot adequately staff the clinics. This poses a danger to the inmates who are suffering from a true medical emergency.

138.     Jane Doe 37 is a nurse and states that the clinics have been understaffed throughout 2021. She has seen the clinic so understaffed that they could not meet essential staffing functions and should have been closed though it was required of course to stay open. Staffing shortages have been a continuing real issue and it has affected patient care and is getting worse.

139.     Jane Doe 39 is a detentions nurse and is assigned to the 1200 jail. Her major frustration is that her workplace is losing so many security and medical people. She believes the high attrition rate is due to people simply being tired

and worked too much.  In the past, nurses had to work maybe a couple of years passing out pills on the medication cart; now, because of the turnover, she sometimes had to work a medication cart on the floors despite being there longer. The two hardest floors to work are the 2nd and 4th where an inordinate number of inmates are on Librium or Valium tapers. The nurses' jobs are made more difficult with that many people on drugs.  Very few of the inmates will open their mouths and raise their tongues so the nurse can verify they have actually taken the prescribed drugs. Jane Doe 39 has seen more broken jaws from inmate-on-inmate fights than she had seen in all her previous years.

140.     John Doe 14 states that on one shift in the last week of August 2021, the medication cart did not finish giving out medications until about 1 am because we did not have anyone to escort the nurse and the cart.

141.     John Doe 11 states that in an eight-month period, the sewage pipes in 701 jail basement backed up three times and appears not maintained properly. Sewage flooded the basement facilities to include the basement control centers, law library, and the medical clinic.

## VI.   Harris County must provide safety vestibules and adequate, working doors that can be locked and unlocked.

142.     According to jail standards, Harris County must provide doors to inmate secure areas that can be locked and unlocked safely. Harris County has

failed to meet this jail standard. *See* Tex. Admin. Code §260.136; §260.148; §260.150; §260.152.

143.     It is an ongoing and well-known issue with the pod door system going out and preventing the electronic locks from working. There have been many reported instances of complete system failures that prevent the security doors and electric locks from working. Numerous maintenance orders have been entered, yet Harris County will take multiple months to fix the issue, putting employees and inmates in continuing danger.

144.     John Doe 5 states that the jail is not secure. In one week in August, Harris County had two different incidents where people on the outside got into the secure area of the jail. These kinds of mistakes happened because employees are overworked and are understaffed. The doors throughout the facility are being replaced but there are still ongoing issues. On the 5th floor of 701, the main door that connects the secured lockdown from the visitation side went down. It had an electrical issue and could not be controlled and it needed a master key to open it. The master key for those doors are kept in the basement and there is not enough of them. Due to this, instead of keeping the door locked and fetching and securing the master key, the door was left unlocked with tape. This is a security and escape risk. Some issues with the doors are electrical, some are mechanical from the doors sliding open for years

being just worn out. The inmates have the ability to open the secure doors because the maintenance was not kept up with and the doors are not properly adjusted. That has led to safety issues. The inmates pop their doors in order to fight other inmates and to fight detention officers. He watched a video the other day where an inmate popped the door in order to rush at a DO and fight him.


[21]

145.    John Doe 14 states that there are issues with doors not working, there seems to be more of an issue in the basement than on the floors; however, the system does shut down every once in a while, and then nothing works and it is never known when it is going to happen. The 6th floor was having their

---

[21] Picture of the door separating the secured side of the 5th floor of the 701 jail from the unsecure side.

cameras installed and the FCC was out of commission, a building page was made for deputy/inmate fight and people naturally ran for the stairs to respond, however the FCC had no control of the doors and responding officers had to go back down one flight of stairs, to the 5th floor, go through the safety vestibule there, and take the secure side elevator up to the 6th floor. That is time wasted in an emergency.

146.    Jane Doe 25 worked as a detention officer for the Harris County Sheriff's Office. At the end of June 2021, 7B pod inmates lit a fire on the 7th floor of the 701 San Jacinto Jail. The fire alarm went off, alerting the building of the fire. The elevators ceased because the fire alarm was going off. This was the time Harris County was remodeling the 7th floor of the San Jacinto Street Jail. The FCC personnel could not let responding personnel onto the floor to help. The keys in the FCC could only open the custody door but not the outside door that leads to the unsecure side. Help from other floors must come up the staff stairway which is on the unsecured side of the door. The 7th floor is the top floor of the 701 building and staff must come up to the 7th floor wearing the fire safety gear. The staff outside that responded to the alarm could not open the door to get into the secure side in order to respond to the fire. They did not have a key to open the door and the key in order to open the doors from the civilian side are kept on the first floor and unavailable. The

staff inside could not open that door because there was no key. The FCC could not open the door electronically because the control panels were removed as part of the remodel. The only way in or out of the secured side of the 7th floor was through the secure side elevators which would automatically stop working when the fire alarm was triggered.  Jane Doe 4 a jail supervisor, who worked on the 7th floor of the 701 jail during this time, states that this is an ongoing problem while renovations were occurring.

147.    John Doe 14 was assigned to pod 7B of 701 on the night of November 15, 2019. He began conducting rounds in 7B at approximately 22:00 hours. After concluding rounds in 7B1 he proceeded to 7B2. Once he entered 7B2, he noticed an inmate was at the phones. He continued to conduct rounds. As he approached the bottom tier round sheet, the inmate began to swear at him. John Doe 14 turned to inquire what was going on. The inmate yelled, "Y'all on some bull***t." When John Doe 14 asked what he meant he did not respond. John Doe 14 continued rounds and then he was jumped by the inmate from behind.  John Doe 14 was blindsided and on the floor being punched, kicked, and kneed several times for several minutes. The DO in the PCC was unable to make a page using the building intercom system and was unable to open the door because the system had shut down and was rebooting, as it had done several times in the past. The reboot was unexpected, and it would

always be a surprise when it happened. The DO in the PCC called the Floor Control Center (FCC); however, the computer there also went down, and they were unable to make a page for assistance. The FCC had to contact the CSC to make a building page. The FCC was unable to allow the responding officers from other floors onto the 7th floor secure side as they no longer had control of the doors. The sergeants on the floor and responding rovers were unable to open the door with a key because the door jammed, and they had a difficult time trying to pry it open. The DO in the PCC was ordered by a sergeant to not leave Pod Control Center (PCC) to assist. John Doe 14 believes it took the responding officers 8-10 mins to finally get inside based on his experience and talking about the incident with his friends that responded. By the time responding officers were able to open the door, the inmate had gotten too tired from assaulting John Doe 14 and had returned to his cell. The inmate told a responding Sgt., "If I wanted to, I could of killed him and there was nothing y'all could of done to stop me." After the incident, it was ordered that a third DO must be assigned to 7B but there was never a third person to fulfill that spot. The floor was already short staffed. When available, a rover would stand at the entrance of whatever cell block the round was being conducted and leave once the rounds were done. Harris County did not take steps to fix the door issues until 2021.

148.     John Doe 2 responded to the November 15, 2019, incident. The DO in
the pod control center was yelling for staff to help John Doe 14 as the pod DO
could only watch his coworker being beaten by an inmate. Staff could not get
into B pod because the doors were not functioning. In B pod there is always
an inmate on 30 minutes out time where they are allowed to be out of their
cell and use the day room area. They do this one at a time. The inmate who
was out was known to have mental illness. When John Doe 2 arrived on seen,
staff was yanking on the door trying to open the door. He ordered a DO to go
to the FCC to get the master key in order to open the door.

149.     John Doe 14 was taken to Memorial Hermann hospital in downtown to
be evaluated after he was assaulted. His right eye was swollen shut, he had a
split upper lip, and a bloody nose. He experienced pain in his knees, wrist, and
shoulders. He was experiencing blurry vision, headaches, and dizziness. The
doctors were unable to find any broken bones, so they cleared him to return
to work the next day. John Doe 14 sought treatment from his physician for a
second opinion. Harris County's worker's compensation insurance denied
coverage for John Doe 14's injuries and the worker's compensation insurance
did not cover John Doe 14's time off while he recovered from being beaten
by an inmate. John Doe 14 still suffered from knee and wrist pain. He would

also like to speak to a psychologist regarding his trauma, but that doctor's order was also denied by worker's compensation insurance.

150.    Detention officers do not get the same worker's compensation coverage as deputies though they can be in the same environment in the jail and subject to the same injuries. Often, detention officers have to go weeks without coverage for their injuries.

151.    John Doe 14 states that there was another incident in 7B, in the month following his incident. An inmate housed in 7B attempted to attack a floor worker that was picking up trash. The DO got in between the inmates and he was punched. He fell to the floor and the inmate then began to drag him to the inmate's individual cell. The pod officer made a page; however, seeing as the inmate was close to fully dragging the other officer in to the cell, he left the PCC and entered the cell block to rescue the officer.

152.    Jane Doe 4 was assigned as a jail supervisor on the 4th floor of 701. In pod 4D there was an inmate fight where an inmate jumped another inmate. The system failed and the detention officers could not get to the inmate for 30 minutes. The inmate had to be transported to the hospital. There is no training given to detention officers on what to do in this situation and where the emergency keys are. The department relies on the sergeant to be at every scene in order to give out this knowledge, but the sergeants are also understaffed.

With the constant turnover of staff, departmental knowledge is not passed on to new employees.

## VII.   Harris County fails to keep the temperature in the jail facility in compliance with jail standards.

153.    Jail Standards states that the "[t]emperature levels shall be reasonably maintained between 65 degrees Fahrenheit and 85 degrees Fahrenheit in all occupied areas" and that there should be sufficient ventilation to provide fresh air. Tex. Admin. Code §260.154-260.155. Harris County fails this **minimum** jail standards.

154.    Temperature control is a major problem in the Harris County Jail. Maintenance requests are entered daily on some floors that are chronically out of compliance with Jail Standards temperature range.

155.    Jane Doe 3 worked as a jail supervisor on the 4th floor of 1200 jail. During that time the A/C did not work on that floor for about two years. That floor has no ventilation or windows. The walls of the building were sweating it was so hot. The floors would be wet from the sweat coming from the walls. Tape would peel from the walls. Another jail supervisor passed out from the heat and was sent to the hospital for heat exhaustion. During this time the staff and inmates were not provided water or fans. One pod that housed mentally ill patients would often fail the temperature checks as per jail standards but the maintenance contractor, Aramark, told her that it was failing temperature

checks, but Aramark would not put in portable units because the mentally ill inmates would break them. There were portable units, but they would not install them. The Sheriff's Office did install portable A/C units in the "Been There Done That" program pod that was a special program often visited by the Sheriff.

156.     Jane Doe 19 and Jane Doe 24 worked at the Harris County Jail 701 San Jacinto Street facility as detention officers. From at least July 2018 until the present the 7H dorm would frequently have temperature readings above the standards set by the Sheriff's Office. The temperature must be between 65-85 degrees but the temperature would routinely exceed that. The maintenance contractor, Aramark, would monitor the temperature but would never take actions to fix the situation. Aramark stated that the issue was due to the construction of the building. The temperature readings would be logged daily in the e-log. When the temperature was out of compliance, a maintenance request was submitted. It was an open dorm pod that had around fifty inmates. Temperature in the picket would be monitored and would exceed 90 degrees and the cell block was much hotter. Floor supervisors put in multiple requests about the heat. It was hot even when it wasn't hot outside because there was no air circulating in the building. There were no windows or ventilation.

157.     John Doe 2 states that pod H on the 7th floor of 701 gets very hot. The detention officers in the PCC would complain to him as a jail supervisor. It was a chronic issue and if the PCC was hot, the inmates in the pod were even hotter. The air did not move. He emailed maintenance and command staff about the issue. After nothing getting done about it, John Doe 2 took a laser thermometer and took readings inside the pod. He took readings from an inmate bunk that was along an exterior wall. The temp read in the 90s. He sent emailed a picture of the readings to maintenance. The maintenance personnel stated that they only have to take readings from the center of the room and that it did not matter if the bunk by the wall was hot. The work orders for the heat were never fulfilled and the pod was never serviced. The issue would continuously come up and the pod would be hot year-round, but it would be especially hot in the summer.

158.     John Doe 10 and Jane Doe 3 are both jail supervisors employed by Harris County. Both state that the 6th floor N, M, and L pods, at 1200 Baker exceeded that minimum jail standards for several months in 2020. The pods would frequently read as too hot through monitoring done by the maintenance staff and the HCSO compliance team.

159.     Jane Doe 20 states that on a particular hot day in May 2021, the 6th floor of the 701 jail registered temperature readings of 93 degrees.

160.     Jane Doe 45 is a civilian counselor. She often works on the 4th floor of the 1200 jail. There it gets extremely hot to where everyone is sweating. Everyone suffers. She gets overwhelmed by the heat and has to leave the floor because it is too hot. It has been that way for a long time, but she believes it could be fixed because she has also been there when it has been freezing. She thinks whoever is controlling it just does not do a good job.

161.     John Doe 19 checked in at 1200 and smelled an odor of drugs on September 1, 2021. He was then sent to the 701 jail, 5th floor because it was understaffed. It was hot there, and he sweated. It would have been hotter for the inmates. There was no T-card/arm band count done where he worked. Overtime and working conditions are the worst he has ever seen.

162.     Jane Doe 31 states that floor counts are not being done regularly because there is not enough staff to accomplish it. The numbers are being sent but the counts are not being done. She does not always know who is in the pod she is supervising because the process of marking inmates out when they go to court or medical has just broken down with the lack of staffing.

163.     John Doe 20 states that he and the others on his floor did T-card to armband counts whenever they could but Corretrak rounds and short-staffing made it almost impossible to do when it needs to get done.

164.    John Doe 14 states that there are issues with the air conditioning on the floors where the temperature is too high. When DOs placed a work order, maintenance asks for a reading of the temperature. The DOs gave them a reading. Maintenance then came to the pod at about three or four in the morning and do a reading. Of course, the temperature had dropped by then, so nothing is done about the hot temperature during the day. John Doe 14 is hard pressed to order the inmates to be properly dressed while in the dayroom area when the inmates are just standing there without a shirt. Sometimes he has a difficult time breathing because the air is so hot.

## VIII. Harris County is required to provide two-way communications between the inmates and jail staff at all times.

165.    Jail Standards dictates that "[t]wo-way voice communication shall be available at all times between offenders and jailers." Tex. Admin. Code §260.161. Harris County fails this standard.

166.    Harris County purposefully and knowingly created situations whereby employees and inmates would lose communication with each other for a period of days. Maintenance requests are entered for chronically broken communication systems; however, these maintenance requests go unanswered for days or weeks.

167.    John Doe 10 states that having communication with the inmates is an ongoing problem. The speakers for inmate communication commonly get

damaged or do not work. There are pods that have a chronic issue with speaker communication. It is very important for these speakers to work in order for the detention officers to speak to the inmates in order to give them orders on compliance and to check on their conditions and complaints.

168.     Jane Doe 3 states that when the 7th floor of the 701 jail was under renovation, the detention staff could not communicate with inmates held in the pods through the intercom system and the inmates had no way to communicate with the detention staff. The detention staff had to yell through the panholes to communicate with inmates. The floor was supposed to be cleared for the renovations. Due to overcrowding, the floor was not cleared. The renovations were supposed to last two weeks but the renovations lasted more than two months.

169.     Jane Doe 22 states that at the 701 jail the PA (public address) system does not always work. At times she could not hear pages and at times she could not communicate with inmates over the system. To communicate with inmates, she would knock on the window and write something for them to read.

170.     Jane Doe 20 states that there was a chronic problem of intercoms on the sixth floor being out of order. She would communicate with inmates in that area by poking her head outside the door.

**IX.    Harris County shall provide adequate fire safety equipment, detection, and staff training in order to protect staff and inmates from fires.**

171.    **Minimum** Jail standards requires that fire safety equipment be provided, and the staff be trained in its use in order to combat fire emergencies in the jail facilities. *See* Tex. Admin. Code §263.53- 263.56; §263.70. Harris County fails this jail standards.

172.    Harris County provides fire safety training for newly hired detention officers. Each new employee attends 4 hours of training in fire and life safety. It is then expected for floor supervisors to take initiative to drill and further train new employees on fire and life safety. Harris County does not provide enough trained jail staff to adequately deal with fire and life safety emergencies.

173.    The Harris County Sheriff's Office Inmate Handbook defines disciplinary rules. Disciplinary rule 1213 states "No inmate shall cause or set a fire of any kind." *Harris County Sheriff's Office Inmate Handbook*, Harris County, p.38 (revision date December 2018).

174.    Jane Doe 4 worked as a jail supervisor for Harris County. She worked on several floors in the Harris County Jail facility during her tenure. From April to June of 2021, she was assigned to the 7th floor of the 701 San Jacinto Jail facility, there were several fires a shift. The staff is expected to put out all

fires in the detention buildings. Detention officers are given fire training when they go through the academy but because of understaffing, there is little to no follow up training, such as equipment drills. The facility fire drills but the floors are so understaffed they cannot respond.

175.    Jane Doe 3 reports that from May 2021 to present, the inmates in 7B light fires in their cells at least once a day, sometimes more. Nothing has been done to prevent the inmates from lighting the fires. Jane Doe 4 made suggestions to the command staff that the inmates that start fires should be moved from B pod so they would stop setting fires, but nothing was done or any moving of the inmates was delayed.

176.    Jane Doe 28, Jane Doe 29, John Doe 24, and John Doe 25 state that in K pod on the 2nd floor of 1200 jail, seven inmates started fires and there was not enough staff to cover the event. The sergeant who was assigned to the floor had left the area. They called for help, but it took nearly thirty minutes for help to arrive.

177.    Jane Doe 39 states that K pod on the 2nd floor of 1200 jail is a "nightmare" pod because inmates there set frequent fires, sometimes two or three a day.  When rovers are called to put out fires, they have to leave the nurses that are managing the medication cart unescorted. This has happened to her and it is very unsafe.

178.     Jane Doe 49 is a civilian in the JPC. Harris County will conduct fire drills often where the alarm and lights flash. The civilians do not know when the alarms go off if it is a drill or if it is a real emergency. One time the alarm kept going off and it seemed to the staff that it was a real emergency and the Houston Fire Department arrived. The civilians went to exit the building, but they were ordered to remain at their desks because there was too much work to do. She felt very uncomfortable about this. The civilians have never been given proper instructions on what they should do when a fire drill occurs, regardless real or false. The few times she exited the building during a fire drill, she was instructed by a sergeant to submit a comp time slip for being outside during a fire drill (so her pay would be docked). In August of 2021, the fire alarm went off for several hours. The alarms went off throughout the building. The sound was deafening, and the lights kept flashing. Jane Doe 49 started to feel ill and tried to cover her face from the flashing lights. She finally demanded to be taken to the JPC clinic where it was found that her blood pressure was dangerously high, and she had to go to the hospital. Her and her doctors believe that the constant fire alarms in the building that day made her ill.

**X.     Harris County is mandated to provide an appropriate minimum number of staff in the jail to conduct rounds on the inmates.**

179.    Jail standards requires that Harris County provide enough staff to adequately provide for the care, custody, and control of the inmates 24 hours a day. Harris County must provide enough staff to conduct mandated rounds. Tex. Admin. Code §275.1. Harris County must at a **minimum** provide one jailer or deputy to have direct supervision of up to 48 inmates. Tex. Admin. Code §275.4. Harris County fails this **minimum** jail standard daily. When Harris County meets the minimum ratio it is unable to properly conduct inmate rounds, then Harris County is out of compliance.

180.    The maximum capacity of the Harris County jail is 10,566 inmates.[22]

181.    The staff shortages can cause rounds to be late and out of compliance. With such a large facility, there is not adequate staffing to meet all the duties and requirements necessary to stay in compliance with rounds. Chronic staff shortages often place the jail floors outside the 1:48 ratio. Harris County additionally does not appropriately document staffing numbers to the Commission on Jail Standards. The **continuous** lack of staffing creates egregious safety issues for both staff and inmates. Harris County is fully aware of its staffing issues.

182.    John Doe 1 states that at the beginning of 2021, Harris County detention employees received a disturbing email stating that CorreTrak rounds were

---

[22] Texas Commission of Jail Standards – Abbreviated Population Report for 8/1/2021, available at https://www.tcjs.state.tx.us/wp-content/uploads/2021/08/AbbreRptCurrent.pdf

first priority and ranked even above helping a fellow employee who was fighting with an inmate and inmate fights. "CorreTrak" is the name of the company and equipment that provides electronic documentation that an employee was making or had made an observation round at a particular cell or place. That email was rescinded months later but not after numerous employees were disciplined for not being able to keep up with rounds even though they were not given the help in order to accomplish it. Even with added overtime personnel, there simply is not enough employees to take care of CorreTrak rounds, escort nurses on the floor, take inmates to the clinic, respond to emergencies, answer inmate inquiries (sergeants only), and complete all the other duty-related tasks; and often employees could not get relieved to eat or take a restroom break.  Additionally, policy demands that when an employee enters a cell, another employee will stand at the door (to hold it open in case there is an emergency and more employee back-ups respond), but there wasn't enough staff available for this safety process.  Since the beginning of 2021, the problem has only gotten worse. Every day supervisors ask for volunteers to work past their original 12-hour shift.  The detention officer to inmate ratio sometimes falls below the state-mandated 1:48. In an effort to keep up with CorreTrak rounds, employees sometimes do not conduct the required proper T-card-armband counts, and inmates

returning from court, the clinic, and other places are routinely returned to their cells without being searched.

183.    John Doe 5 is familiar with the daily watch schedules (DWS) and supervises their implementation. When they do the DWSs, it is only a picture of time for that moment. The floor will meet the **minimum** 1:48 ratio at that moment. That number then changes  a couple of hours later but the DWS does not. There are times that throughout the day the jail floor is not in minimum compliance, but it does not reflect on paper. If the staffing shows to be right at the 1:48 ratio then if any DO leaves the floor to escort or to assist another area, then the floor could be out of compliance. These low staffing numbers give no flexibility. Based on his training and knowledge, 1:48 ratio should be direct observation; however, the jail is so short staffed. If there are 100 inmates in a four-sided pods, there should be multiple DOs in the that pod to watch those inmates but that is not happening. The **minimum** staffing numbers were last created in 2018. Those numbers were set with the Texas Jail Commission as an absolute **minimum** for the floors, but the numbers do not take into account what the floor needs to function well on a daily basis. Those are emergency numbers. Today, the floors are not even making those **minimum** staffing numbers. It can be deceptive when you look at the numbers because the floors can be in ratio, but the floors cannot function. For example,

on the 6th and 7th floors of the 701 jail, on those floor the inmates are maximum

security inmates and require two detention officers to escort them out of their

cells but these staffing numbers do not account for that. The CorreTrak rounds

only allow for a few minutes a round per pod and that just does not allow time

for the DOs to talk to the inmates, address problems, or to do tasks to meet

their needs. Just simple stuff like getting an inmate toilet paper or an extra

blanket just cannot be done with these low staffing numbers. The duties of the

employees have increased but the staffing has not increased. CorreTrak has

tripled the workload on the floor.

184.     Jane Doe 1 states that the staffing reports transmitted to the Texas Jail

Commission are always incorrect and are essentially fabricated because most

floors cannot stay in compliance throughout the shift. It is a shell game of

moving staff from one section to another to be counted on multiple floors to

make ratios for the paperwork to be filled out. This shell game activity is done

daily. Supervisors are being counted to make **minimum ratio** along with

overtime workers that will not be available the whole shift. It makes it appear

on paper that the jail is in compliance, but it is not.

185.     John Doe 34 states that the staffing numbers show the jail to be in ratio.

Only a couple times has he seen the DWSs out of ratio, though later the DWS

was amended to show that the floors was back in ratio. You can be in ratio

and not function. He does not know if they are actually making ratio or not but the jail is not functioning. The ratio is including the rovers, the sergeants, and the trainees at times. The ratio does not show the number of people needed to do the job.

186.     John Doe 35 is aware that the Harris County jail is in violation of jail standards. People are being moved around constantly in an effort to meet jail standards, but the standards are not being met. The safety of the staff and the inmates are in jeopardy because the jail is understaffed. For example, on September 7, 2021, a detention officer was up on the floor and he was assigned to escort an inmate to the clinic. As he was going to the clinic, another inmate who was not escorted to the clinic came up behind him and punched him in the back of the head, blindsiding him. The inmate that assaulted the DO should have had an escort but with short staffing, corners are being cut.

187.     Jane Doe 4 states that the Department often does not meet the 1:48 ratio. In order to make ratio, the department will count admin detention officers, sergeants, the building lieutenant, and on occasion, will have to count the captain of the building in order to make the **minimum** 1:48 ratio on paper. They often count people that do not have direct contact with inmates, will not respond to floor issues, and never directly supervise the inmates. When they count the auxiliary staff, those employees do not move to the floor in order to

actually supervise the inmates. People will be pulled from assignment and moved to the other jail building to staff; however, the person was counted in the first building and the second building. On some of the floors, there will be one detention officer with direct supervision of 110 inmates, meaning there will be one DO working a four sided pod to watch 110 inmates at once. The department relies on the count of other workers in order to state that there is direct supervision of the 110 inmates.

188.     Jane Doe 10 states the jails just keep getting worse. There is not enough staff to keep the DOs safe. The jail is not meeting jail standards and the floors are not making ratio. The DOs are all scared of getting fired for anything that they do that they are more likely to not act than to act in a situation. Morale is terrible.

189.     John Doe 27 is assigned to the 6th floor of the 701 jail.  The floor is always short on staff. On or about Thursday, September 2, 2021, an inmate assigned to his pod on the 6th floor was assaulted by another.  John Doe 27 was alone in a four-sided pod when normally there should have been two detention officers. The beating was brutal. The incident was captured on camera.  He thinks it took a long time for rovers to respond. The assaulted inmate was transported to the hospital with serious injuries. John Doe 27 is afraid the assaulted inmate is going to die from his injuries. He is also

concerned that he is going to get blamed if this is a death in custody but there was nothing he could do to help or prevent the attack on the inmate because of the conditions that are allowed to exist in the Harris County jail.

190.    John Doe 22 has been assigned to the 7th floor of the 701 jail in 2021. He states that for at least three days of each week in 2021, there were only two rovers working the floor. There should be a minimum of four rovers assigned to the 7th floor. With the rounds that need to be done and the inmates escorted to the clinic, it is impossible for the rovers to respond to any other calls such as inmate fights, inmate disturbances, or any other call. He has been told that if there is an inmate fight or a deputy/inmate fight, it is more important to do the CorreTrak rounds than to respond to pages. This puts officer safety at risk. It is a violation of policy for the detention officers to enter the cell blocks by themselves but with the staffing shortages, they have no choice but to in order to complete the tasks required under the staffing shortages.

191.    Jane Doe 3, a former jail supervisor, states that she knows that DOs are trained that for officer safety they should never enter a pod alone; however, they are commonly forced to enter pods alone due to staffing shortages.

192.    Jane Doe 2 is a jail supervisor in the JPC. In August 2021, JPC supervisors received notice that they must send enough personnel to the housing jails for them to meet the **minimum** 1:48 ratio.  The JPC has two

floors with various stations for processing inmates into and out of the jail system. The various stations include a search wall, intake, receiving, booking, pre-trial court, JP court, a clinic, classification, and releasing. The system is designed to have sixty-six non-supervisory employees to process people through the various stations. In August, fourteen detention officers resigned. With the current personnel shortage, the processing division starts with about fifty-nine on a good day; then some of those have to be sent to the 1200 and 701 jails, and certified deputies are sent to guard prisoners at hospitals. On August 28, 2021, JPC had only thirty-seven employees to work areas that require a minimum of sixty personnel after detention officers were pulled to work in 701 and 1200 housing, and all the deputies were sent on hospital runs. On August 10, 2021, there were only forty-three employees; on August 16, 2021, there were fifty-six. As a result of the understaffed manpower shortage, when employees showed up for the evening watch on September 2, 2021, there were fourteen peace officers standing in line in the receiving area to turn their prisoners over to JPC staff in order to book them into the jail. This has not been unusual in the last couple of months since JPC staff are being pulled to work housing and it is putting a strain on the JPC operations and security. This wait keeps the deputies and officers off the street longer and delays the new inmates being processed in and out of the jail. On that day there was not

enough staff to man every post in the JPC and several posts had to be combined for the shift. Every post had half the people that the **minimum** staffing requires, greatly outnumbering the staff to the inmates, sometimes putting three staff who are doing computer processing to move inmates through the system with the responsibility of supervising over 120 inmates at the same time. There is not enough staff to provide security to all the areas in JPC. It has become common for only one male detention officer to be assigned to the search wall in JPC.

193.     John Doe 23 is a detention officer assigned to the Joint Processing Center. He was assigned by his supervisor to work the "search wall," which is the area where newly received inmates are searched prior to being booked into the JPC. By policy, this is a two-man assignment so two detention officers can back each other up on combative inmates and armed inmates. Guns and weapons have been recovered during searches at this station. John Doe 23 was assigned to this post and told to work it alone due to staff shortages. He was told his backup would be the detention officer assigned as intake security that is located around a corner from the post. No other detention officer was put in the line of sight of the station. The policy violation was brought up to supervisors but because of staffing, no detention officer could be spared to fill the open position.

194.     Jane Doe 12 states that at the beginning of August 2021, an order went out stating that the JPC could not refuse to send staff to housing (1200 and 701). JPC was only refusing to send staff that would put their areas at risk but now they cannot hold their staff. The daily staffing is documented on the DWSs sheets on how many detention officers are sent to centralized staffing. The Houston Police Department (HPD) gives Harris County money in order to subsidize the staffing of the JPC with a contract. She does not think Harris County is meeting the terms of that contract because the staffing is not being utilized in JPC that HPD funding is providing.

195.     John Doe 18 states that the jails, including the JPC where he works, are unsafe because of the "staffing crisis."  There are too few people to work safely because the jails take a third of the JPC employees every day.  He is sure there will be an event where employees are injured; thankfully, it hasn't happened yet.

196.     Jane Doe 18 maintains that working any of the jails is "absolutely unsafe" because there are not enough staff.  She generally is assigned to the JPC, but in August 2021 she did work at the 701 jail for half a shift on the 5th floor. The area was under construction, and it took a full two minutes to unlock or lock the doors with a key.  That shift, the pod she was assigned had no intercom, so she could not make pages or hear others' pages.  She was given

a radio to call for help. She was told to keep her head down and mind her own business. She worked alone and did not try to enforce any rules on the inmates. She worked with one employee on the 5th floor that day that was on overtime and was working past 16-hours in her shift because she could not get relief. Jane Doe 18 was supposed to be relieved that day at 10:00 pm but relief did not arrive until 11:30 pm.

197.    Jane Doe 23 works at JPC. She and her peers were told repeatedly by "the chain" (their chain of command) that they would take the JPC down to one person in intake and one in releasing if need be to meet the 1:48 ratio at the jails. She remembers one time there were only four people working in intake and they had about 200 inmates to process. That is dangerous in an open concept situation.

198.    John Doe 10 has worked as a jail supervisor in the 1200 Baker Street Jail. The third floor of the 1200 Baker Street jail has been run with a minimum of fourteen detention officers assigned to the floor. That number involves reducing the number of two-man pods and only assigning one detention officer to the pod. The one detention officer will then be responsible to direct supervise ninety-six inmates at once.

199.    John Doe 4 is a retired jail supervisor who retired in March 2021. There are chronic issues with the understaffing of the JPC. The JPC needs a

**minimum** of sixty personnel to function on the inmate processing. It is a very technical job that takes specialized training. Sixty detention officers are considered a skeleton crew for all the intake, booking, releasing, property, pre-trial waiting, classification and clothing, hospital transports and hospital securities, PC courts, lockdown, and the intake clinic. When the JPC is understaffed, it creates a safety issue. The arrestees come off the street still high, drunk, and combative as they are moved through the booking process and creates problem when it is delayed. The JPC must meet the 1:48 ratio and to meet the quota, Harris County will count everyone in the building with a jailer's license to make the ratio. This will include detention officers and deputies that are on transitional duty but are barred from responding to emergencies. There are many times when lieutenants and captains are also included in the count in order to meet the **minimum** 1:48 ratio. Many people are counted that have no ability to respond to emergencies or disturbances.

200.     Jane Doe 8 has worked for Harris County for almost a decade and states that she believes the conditions in the jail are the worst it has ever been. It is a struggle to find people in order to meet the **minimum** 1:48 ratio in 1200 Baker. The floors may start off in ratio because people are doing overtime but, with 12-hour shifts, people on overtime only stay for four hours so the floors do not stay in ratio. The floors cannot function at the minimum ratio set by

the staffing plans. The tasks of the detention officers have increased but the staffing has not increased.

201.       Jane Doe 7 works on the fourth floor of the 701 Jail. On most days the floor is run with thirteen staff including the floor sergeants to direct supervise up to 700 inmates. There have been shifts were there have only been eleven or twelve staff members. Often the shift will start with fifteen and then an hour into shift Harris County will pull staff to work other floors, putting the staffing level at thirteen or fourteen individuals. To meet **minimum** jail standards, a floor with 700 inmates would need to be directly supervised by fifteen detention officers. She further states that to make count on the floors, Harris County has been placing trainee probationary employees on the floor and assigning them to a pod alone after only a few days of training. The department will include these trainee employees in the count to meet the **minimum** 1:48 ratio. She has witnessed trainees with only one or two days of training being placed in a pod alone and the trainees are told to just sit there and to not let any of the inmates out. Per policy, trainee employees should only be placed in two-man pods where they are partnered with experienced DOs. This was on the 6th floor where the inmates are kept in single man isolation cells. Jane Doe 7 believes that by knowingly placing probationary

trainees in positions to supervise inmates without receiving minimum training puts the lives of the detention officers and the inmates at risk.

202.     John Doe 15 has been a detention officer with the Harris County Sheriff's Office since 2013. Every shift he is assigned to work on a floor of the 701 jail. He works twelve hour shifts but is commonly held over to work sixteen hours. It is impossible for one person to do all the rounds on a floor in a shift. It requires multiple rovers assigned to do rounds but then they cannot do their other duties. Now rounds are conducted using a cell phone like device called CorreTrak. There is no accounting of these machines or of who is logged in doing the rounds. Detention Officers are barred from putting staffing shortages as a reason for a round being late, even if it is the reason a round is late because that would look bad. He has been told that by the command staff. There are not enough devises for each detention officer, so the CorreTraks are passed around from officer to officer and there is no accounting for who is doing a round. It is well known that there are staffing shortages at the jail and on the floors. He knows that there are some days when the floors are maxed on inmates but there is not have enough staff to meet all the functions of the floor.

203.     John Doe 2 is a jail supervisor. He supervised in the jail for two years. During that time, staffing was a chronic issue. There were several times when

there were not enough detention officers to make rounds so he made their rounds. There were numerous times when he and another detention officer had to finish the floor count without other detention officers because the floors were short on staff and other detention officers were needed elsewhere.

204.     Jane Doe 14 is normally assigned on the 4th floor. It needs a minimum of twenty-five people to staff the floor because male and female inmates must be kept separate and other staff members, particularly maintenance and medical, must be escorted. (That is not the case on all male floors.) Sometimes, however, the floor is staffed with as few as seventeen people. **The understaffing creates a huge safety issue.** When the floor only has three rovers, one is assigned to B, C, F, H, pods; one to K, L, M pods, and one to the remaining pods.  Those rovers must take female inmates to the clinic, take care of ATWs, courts, escort a nurse checking temperatures, another nurse checking Covid, and an assortment of other assignments.  Most importantly, rovers must conduct CorreTrak rounds that cannot be late.

205.     Jane Doe 4 states that the 3rd floor of 701 houses between 650 to 700 inmates. The floor needs a minimum of fifteen detention officers to function properly. It was common to have to run the floor with ten to eleven people on the floor. Ratio was not met with people that work on the floors and the County would have to count other staff like administrative staff in order to

meet the ratio on paper, but the ratio was not met in practice. The rosters are done in the morning, but they do not reflect who is actually on shift on the floor. The roster would show people that would be coming in at different times due to life issues or medical issues not being able to work 12-hour shifts every day. Also, once the roster is done, detention officers would then be pulled to go to other floors that have staffing needs, leaving the floor short.

206.      John Doe 2 states that some floors, such as the 7th floor of 701 can meet the **minimum** 1:48 ratio on paper without having enough staff to meet the needs of the floor and the inmates. The 7th floor is a high security floor and has several pods that are single man cells. The 7th floor has thirteen pods. Two of the pods observe four dormitories each, holding at least 96 inmates, requiring two DOs. One pod is a double lockdown pod that requires two detention officers. A person must be manning the pods 24/7. To minimally man the pods and FCC, requires seventeen employees. These minimum standards and 1:48 ratio do not take into account the actual needs of the floor and the needs of the inmates. The floor needs at least four rovers in order to function properly, rover positions are there for emergency calls, to do rounds, to respond to inmate fights, to feed the inmates, escort civilians and medical staff, to escort inmates to the clinic, to pass out inmate laundry, and to relieve pod workers. The floor really needs twenty-two detention officers to function

safely though there are times when it is staffed only with enough people to man the pods. Due to the fact that there is a need for more people on the 7th floor above the needed ratio, the extra bodies will be used to meet inmate count on other floors. Harris County will do the **minimum** 1:48 ratio counting all the inmates in the building and all the staff in the building as opposed to looking at who has direct supervision of an inmate.

207.   John Doe 14 states that on a continuous basis individuals are assigned to pods of ninety-six inmates or more with only one officer, or if there are two officers, one is constantly being called out to assist on the floor, either escorting inmates, conducting rounds, or assisting on a different floor because that floor does not have rovers. He has been assigned to a multi-sided pod alone to supervise 106 inmates at one time. When he started, rovers did everything on the floor, from escorting inmates, walking the nurse, escorting maintenance when they were on the floor, feeding the inmates, and having one rover dedicated to keeping the floor workers busy throughout the night; however, with the new rules that were implemented by the jail commission, CorreTrak, and understaffing that is no longer the case. **The staffing has not kept up with all the extra duties detention officers have.** The inmates are getting bolder, and they no longer fear consequences for their actions because

they know that the floors are understaffed and if push comes to shove, they'll be removed from their housing for a couple of hours and that's it.

208.     John Doe 30 has been a detention officer with Harris County for the last ten months.  He asserts that the 1200 jail is unsafe because of insufficient staffing. John Doe 30 points out that when staff enters inmate dormitories that have open housing for inmates, they are alone with a large group of inmates. Policy requires that staff members entering inmate cellblocks at least with another staff member at the door, but there are not enough people for that to happen. He went through training and was taught that for officer safety he should enter these cellblocks with a partner but that does not happen in reality because of staffing issues. John Doe 30 is aware that a fellow staff member was assaulted and injured on the 5th floor by a group of inmates. The floors are understaffed, and inmates often have, or at least seem to have, control of the jail and he states it seems that they always get their way to the detriment of the staff. Recently John Doe 30 witnessed an incident where an inmate threatened a staff member and the sergeant moved the staff member, not the inmate. There were no consequences for that inmate.

209.     Jane Doe 15 has a CorreTrak monitor in her PCC that sometimes does not work properly. At times when the CorreTrak system is not working properly, a green circle will appear. Sometimes the green circle will turn off;

sometimes it will not. When it does not, Jane Doe 15 must turn it off to reset it, and when that occurs, she may be late on her rounds.

210.    Jane Doe 7 states that on August 24, 2021, the 6th floor of 701 ran with only two rovers for the floor. Normally there are six. Each pod had only one detention officer though two pods (F and J) should be two-man pods because they monitor four dormitories. The sixth floor has twelve pods plus the FCC and the N cells (isolation cells). There are approximately 700 inmates housed on the 6th floor at any one time. With the floor having sixteen detention officers, the floor made ratio if all the DOs and inmates are counted collectively but the floor could not function. There were not enough people to work the two-man pods that monitor ninety-six inmates and only one detention officer was assigned. One rover had to constantly do rounds while the other dealt with inmate fights, inmates flooding their cells, and other duties. The pods are tiered, so he had to walk up and down a flight of stairs in each pod every hour for the whole twelve-hour shift. He walked at least 288 flights of stairs in a shift. Even going at his fastest, he could only do rounds in six pods before the rounds were out of compliance. That is going to each CorreTrak scanner and scanning the round, not taking any time to look at the inmates or have any meaningful inspection of the inmate's condition.

211.     John Doe 13 is normally assigned to work the FCC on the 3rd floor of the 1200 jail. At one time he was told that the number of employees required to safely work his floor was seventeen. Over time that number has dropped to sixteen. Today, it is fifteen, and that number includes trainees who are also used to bolster the roster to make it look like more people are working. That number also includes employees who are on FMLA[23] and are limited to an 8-hour workday, so they come to work later or leave earlier. The 3rd floor has worked with as few as twelve detention officers. There should be at least two rovers just to keep up with CorreTrak rounds, not counting all the other duties that are required for rovers.

212.     John Doe 6 is currently assigned to a housing floor at the JPC. The floor has worked short-handed but within the 1:48 state-mandated ratio for some time. About a month ago, however, he and other jail supervisor received an email that originated with Chief Shannon Herklotz informing them that when admin (centralized staffing) calls asking for people to help, they must send them, no matter what. The email indicated that the jails at 1200 and 701 periodically fall below the **minimum** 1:48 ratio. On August 24, 2021, he only had eleven detention officers: nine assigned to pods and two rovers. The maximum inmate capacity at Housing at the JPC 3rd floor is about 500 and it

---

[23] FMLA, as used in this complaint, stands for a bundle of benefits used by employees of Harris County based on the federal statute 29 U.S.C. 28 informally named the Family and Medical Leave Act (FML).

normally hold about 500 inmates. When anybody leaves the floor to escort an inmate to the clinic or a purple band inmate anywhere, the floor will fall below the accepted ratio on the floor. Due to this new method of taking people from floors where they are needed, there is no wiggle room for emergencies. Now when there is an emergency, we make a building page so someone from Booking, Releasing, or Processing can come aid because the personnel on the floor are so shorthanded, they cannot handle any inmate disturbances.

213.    Jane Doe 12 states that every day is a fight for staffing and where people are going to be. As jail supervisors, they are always fighting to keep the staff in order to keep their areas safe but everywhere is short. Safety is being put at risk every day. She is afraid that it is going to take a catastrophic incident to make Harris County care about safety.

214.    John Doe 14 states that employees are being moved and reassigned from everywhere to help with staffing, **but they are not trained for the jobs they are assigned to do.** For example, detentions officers from the JPC are being moved for a shift in 701. Some of the JPC detention officers have never worked the jail, they do not know the floor set-up, and they are unfamiliar with the equipment and how it's used. For instance, on August 31, 2021, two individuals from JPC were reassigned for a shift to 701 but neither of them had ever worked at 701. They could not access out folders to submit

paperwork, they did not know that they could call OMS to get access in order to do rounds and did not know when or where to send inmates when they were called. John Doe 14 does not blame them because they were assigned to work JPC and that is all they know. "However, if an emergency were to occur and they are not able to find their way around to open doors on the computer or if, God forbid, they get locked out, what happens then?" John Doe 14 recalls an incident where there were two officers in a pod, one who was assigned to 701 and another from 1200. The officer assigned to 701 conducted the rounds however when he went into one of the cellblocks he was attacked by an inmate. The other officer did not know how to work the doors to allow individuals in while in override and ended up leaving the pod control center and going to assist the officer. Fortunately, neither of the officers were severely injured and they were able to go home that day.

215.     John Doe 7 asserts that because of the personnel shortages, he and the other people assigned to the 701 jail are working under conditions best described as hostile. Supervisors are bombarded with emails, threats, instructions to write people up for late rounds or being tardy; everything is a write-up or letter of reprimand; there are no verbal warnings. Management does not want to know what happens on the floor and do not want to hear how short the floors are. He remembers that it used to be the policy that employees

would not enter a cell alone, someone would always have their back standing at the door; but that is impossible with the personnel shortages. When fights break out detention officers may have to respond alone; John Doe 7 sometimes must respond alone. When it comes to inmate confrontations, John Doe 7 realizes he is probably on his own because his coworkers and subordinates are resigning. **Management does not want to hear** that rounds are late because the floor is so short-handed, but that is the truth.

216.    Jane Doe 27 states that the administration stresses the importance of conducting rounds over all other activities. On August 24, 2021, the 6th floor at the 701 jail was so short-handed that rounds were significantly late. The roster may not have an accurate number of employees listed because people who should not be shown as part of the work crew, including trainees, are shown as part of the count.

217.    Jane Doe 50 states that in the last week of August 2021, she saw an inmate arrive at the clinic without an escort. Unfamiliar with the surroundings, he did not know which way to go; she does not know who sent him. Compared to the IPC where she previously worked, a "structured place," where inmates turned toward the wall when females walked by, the 1200 clinic is "unsettling." Her "heart melts" over the recent lack of discipline.

218.     John Doe 11 states that he has seen a detention officer counted for the ratio on one floor at the start of shift, and then an hour or so into shift, that employee is moved to another floor and then counted to meet ratio on that floor. In his current position, John Doe 1 is not considered jail personnel, but he does have an office in the jail facility, and he knows that he is counted to meet jail standards even though he is not assigned to the floor. All rover pages on the floors happen often and they have increased by thirty or forty percent.

## XI.    Harris County shall make a physical count of each inmate at frequent and regular intervals, no less than once per day.

219.     Jail standards mandates that "[i]nmates shall be physically counted by a jailer at frequent and regular intervals, no less than once per day." Tex. Admin. Code §275.5. Harris County policy state that inmate count shall include a comparison of T-Card/armbands.

220.     John Doe 1 states that in the early 90s then Sergeant David Kaup suggested placing an index card box at every cell and putting a "T-card" (short for transfer card) in every box for each inmate in the cell, then move that card with the inmate as they are moved to another cell. That suggestion was adopted and later the policy was changed to conduct count on every shift by comparing T-cards to armband, thus ensuring every inmate was in the place s/he was supposed to be.  That remained the policy for two decades.  Today,

though the policy has not changed, in some cases count is conducted without comparing T-cards to armbands because of the acute personnel shortage.

221.     John Doe 9 states that inmate counts are not being done on every floor at beginning of every shift because supervisors are unable to conduct proper counts. There is not enough manpower to perform all the critical duties now required for the job.

222.     Jane Doe 11 states that Harris County jail policy requires staff to conduct inmate counts on each shift by comparing T-cards to inmates' armbands, but the count is no longer being conducted in this manner.

223.     Jane Doe 20 states that detention officers do T-card/armband count when they can, but often cannot because of acute staffing shortages.

## XII.   Harris County does nothing to prevent the flow of drug contraband into the jail thereby creating a toxic work environment for staff.

224.     Jail standards mandates that "[f]or the protection of jail personnel and inmates" searches for contraband must be conducted. Tex. Admin. Code §275.6. Harris County fails this **minimum** jail standard.

225.     Drug use in the jail is rampant and pervasive. The secondhand toxic effects of being in the proximity of so much drug use in a closed, not vented environment, causes negative effects on the jail staff.

226.     The Harris County Sheriff's Office Inmate Handbook defines disciplinary rules. Disciplinary rule 1524 states "No inmate shall make,